# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WISCONSIN

Gutierrez Family LLC d/b/a El Charro Café, LL Calk Enterprises LLC d/b/a Ettore's Bakery and Restaurant, Elas Crepes,  Drago's Kitchen LLC, House Of Omelets Inc., Tom Demo Inc. d/b/a STACKED, The Wooden Spoon at CV LLC d/b/a The Wooden Spoon, 317 Moonpie Mountain LLC d/b/a Barbed Wire Café, Lauer Hospitality Group LLC d/b/a Avon Cabin Café, SJLK Hospitality LLC d/b/a Dale's, McCarthy Future LLC d/b/a Varsity Inn, J & A Restaurants LLC d/b/a Stingers Pizza Pub,  LKN Cheesecakery LLC, Word of Mouth Neighborhood Bistro LLC d/b/a Word of Mouth Neighborhood Bistro, Creative Restaurants, Inc. d/b/a Rum Boogie, and Startswithone LLC d/b/a The Diner, individually and on behalf of all others similarly situated,

> *Plaintiffs,*

> v.

Cal-Maine Foods, Inc., Rose Acre Farms, Inc., Versova Holdings, LLC, Hillandale Farms of Pa., Inc., Hillandale-Gettysburg, LLC, Hillandale Farms East, Inc., Hillandale Farms, Inc., Daybreak Foods, Inc., Opal Foods, LLC, Urner Barry Publications, Inc., and Egg Clearinghouse, Inc.,

> *Defendants.*

Case No. 3:26-cv-703

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

JURISDICTION AND VENUE ...........................................................................................2

PARTIES ...............................................................................................................................4

    I.      PLAINTIFFS ....................................................................................................4

    II.     DEFENDANTS .................................................................................................8

        A.      Cal-Maine ..................................................................................................8

        B.      Rose Acre...................................................................................................9

        C.      Versova ....................................................................................................10

        D.     Hillandale Farms......................................................................................10

        E.      Daybreak Foods .......................................................................................11

        F.      Opal Foods ...............................................................................................12

        G.     Urner Barry ..............................................................................................14

        H.     Egg Clearinghouse ..................................................................................14

        I.      Unnamed Co-Conspirators and Other Non-Parties..................................15

FACTUAL ALLEGATIONS .............................................................................................16

    I.      The U.S. Egg Industry ....................................................................................16

        A.      Egg Production and Supply Dynamics .....................................................16

        B.      Commodity Shell Eggs Are Fungible.......................................................18

        C.      Consolidation in the Egg Industry ...........................................................21

        D.     How Shell Eggs Are Priced: The Urner Barry Benchmark and ECI.........23

    II.     Anticompetitive Conduct.................................................................................26

        A.      Defendants Conspire to Inflate the Price of Commodity Shell Eggs.........27

              1.     Defendants Coordinated Bidding and Reporting Practices to Manipulate the Urner Barry Benchmark.......................................27

                   (i)      Executing Premium Trades to Give Urner Barry Reporters Something "To Hang [Their] Hat On"..............28

                   (ii)     Coordinating the Timing, Volume, and Direction of Bids to Push or Hold the Benchmark ("Bidding Early and Often").........................................................................29

                   (iii)    Directly Lobbying and Pressuring Urner Barry Personnel...........................................................................32

              2.     Defendants Used HPAI as a Pretext and Deliberately Slowed Flock Recovery to Sustain an Artificial Supply Shortage ............32

B.    The Historically High Price of Commodity Shell Eggs Cannot be Explained by Market Forces ...................................................................36

    1.    The sharp rise in egg prices since 2022 cannot be explained by Avian Flu ...................................................................37

    2.    There were no material constraints to rebuilding flocks and production capacity ...........................................................41

    3.    Input costs do not explain Shell Egg price increases ....................41

    4.    Defendants' Financial Records Confirm Price Increases Were Not Cost-Driven .................................................................43

    5.    The sharp decrease in prices following the DOJ's announcement of its investigation indicates that the price of shell eggs was not driven by market forces ..................................45

C.    Plus Factors Corroborate Defendants' Conspiracy....................................46

    1.    A Government Investigation and Enforcement Action Targeting the Conduct Alleged in this Complaint ........................47

    2.    Defendants Acted Against Their Unilateral Economic Self-Interest.............................................................................47

    3.    Some of the Egg Producer Defendants are recidivist conspirators ...........................................................................48

    4.    Defendants Have a Common Motive.............................................49

    5.    Conventional and Cage-Free Shell Eggs Are Fungible, Interchangeable Commodities .......................................................50

    6.    Commodity Shell Eggs Have Inelastic Demand............................50

    7.    Defendants Have Numerous Opportunities to Collude .................51

    8.    High Barriers to Entry Protect the Conspiracy from Competitive Discipline ..................................................................53

CLASS ACTION ALLEGATIONS ..........................................................................54

DEFENDANTS ARE ENGAGED IN CONTINUING ANTITRUST VIOLATIONS ...............57

TOLLING OF STATUTE OF LIMITATIONS .........................................................58

ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT...........................................59

CLAIMS FOR RELIEF .............................................................................61

PETITION FOR RELIEF ...........................................................................86

DEMAND FOR JURY TRIAL ........................................................................87

This is a class action complaint brought on behalf of eighteen commercial indirect purchaser plaintiffs ahead of the July 31, 2026 filing of the Commercial Indirect Purchaser Plaintiffs' consolidated complaint in *In re Shell Eggs Antitrust Litigation*, No. 3:26-md-03175-jdp, MDL No. 3175 (W.D. Wisc.). Once filed, the Commercial Indirect consolidated complaint will serve as the operative complaint for the Plaintiffs named in this pleading.

Plaintiffs Gutierrez Family LLC d/b/a El Charro Café, LL Calk Enterprises LLC d/b/a Ettore's Bakery and Restaurant, Elas Crepes, Drago's Kitchen LLC, House of Omelets Inc., Tom Demo Inc. d/b/a STACKED, The Wooden Spoon at CV LLC d/b/a The Wooden Spoon, 317 Moonpie Mountain LLC d/b/a Barbed Wire Café, Lauer Hospitality Group LLC d/b/a Avon Cabin Café, SJLK Hospitality LLC d/b/a Dale's, McCarthy Future LLC d/b/a Varsity Inn, J & A Restaurants LLC d/b/a Stingers Pizza Pub, LKN Cheesecakery LLC, Word of Mouth Neighborhood Bistro LLC d/b/a Word of Mouth Neighborhood Bistro, Creative Restaurants, Inc. d/b/a Rum Boogie, and Startswithone LLC d/b/a The Diner, bring this action for damages and injunctive relief individually and on behalf of proposed classes of commercial indirect purchasers of Commodity Shell Eggs against Defendants Cal-Maine Foods, Inc., Rose Acre Farms, Inc., Versova Holdings, LLC, Daybreak Foods, Inc., Hillandale Farms of PA., Inc., Hillandale-Gettysburg, LLC, Hillandale Farms East, Inc., Hillandale Farms, Inc., Hillandale Farms of Delaware, Inc., and Opal Foods, LLC (collectively, the "Egg Producer Defendants" or "Producer Defendants"); Urner Barry Publications, Inc.; and Egg Clearinghouse, Inc. for violations of: (1) the antitrust laws of the United States; and (2) the antitrust, consumer protection, and unjust enrichment laws of the states set forth in this complaint.

## INTRODUCTION

1. This is an antitrust case arising out of concerted anticompetitive behavior by some

1

of the largest egg producers in the United States. For approximately four years, these producers exploited unique structural aspects of the United States egg industry—including a privately-set benchmark used to price nearly every wholesale egg transaction in the U.S.; outsized control over supply by a small handful vertically-integrated producers; and commercial interconnections between and among producers and trading platforms—to manipulate and inflate the price of conventional and cage free shell eggs (hereinafter, "Commodity Shell Eggs" or "Shell Eggs") across the country.

2.      This action is brought to recover for the anticompetitive overcharge caused by the conspiracy set forth in this complaint, and to remedy the conduct that led to it. Plaintiffs and the proposed classes purchased Commodity Shell Eggs at prices inflated by the actions of the defendants and their co-conspirators and will continue to purchase Commodity Shell Eggs in the future. They seek, through this litigation, to recover the damages Defendants' unlawful conduct caused, and to enjoin Defendants from resuming and/or continuing their anticompetitive conduct in the future.

### JURISDICTION AND VENUE

3.      This action arises under Section 1 of the Sherman Act (15 U.S.C. § 1), Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), and the antitrust, consumer protection, and unjust enrichment laws of several states. Plaintiffs' Sherman Act claim seeks injunctive relief, costs of suit, and reasonable attorneys' fees, and the state law claims seek injunctive relief, treble damages, costs of suit, and reasonable attorneys' fees.

4.      This Court has subject matter jurisdiction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331, 1332(d), 1337(a), and 1367.

5.      This Court has personal jurisdiction over all Defendants pursuant to Section 12 of

the Clayton Act, 15. U.S.C. § 22 and 28 U.S.C. § 1391, as well as under relevant state law.

6. Defendants' unlawful, anticompetitive conduct substantially affected interstate commerce throughout the United States, causing injury to Plaintiffs and the geographically dispersed Class Members.

7. Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d), because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

8. This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (1) transacted business throughout the United States, including in this District; (2) manufactured, sold, shipped, and/or delivered substantial quantities of Commodity Shell Eggs throughout the United States, including this District; (3) had substantial contacts with the United States, including this District; and/or (4) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

9. Defendants' conduct alleged here occurred within the flow of interstate commerce, including in this District, and was intended to and did have direct, substantial and reasonably foreseeable effects on the interstate commerce of the United States.

10. During the period starting at least on January 1, 2022, until such time that the adverse effects of Defendants' anticompetitive conduct cease ("Class Period"), Defendants manufactured, sold, and shipped Commodity Shell Eggs in a continuous and uninterrupted flow

3

of interstate commerce, which included sales of eggs in this District, advertisement of eggs in media in this District, and employment of personnel in this District. Defendants' conduct had and continues to have a direct, substantial, and reasonably foreseeable effect on interstate commerce, including commerce within this District.

11. The Judicial Panel on Multidistrict Litigation previously held in its Transfer Order dated February 10, 2026, that this District "will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation."[1]

## PARTIES

### I. PLAINTIFFS

12. Plaintiff Gutierrez Family LLC d/b/a El Charro Café is an Arizona limited liability company with its principal place of business in Tucson, Arizona. During the Class Period, Plaintiff purchased Commodity Shell Eggs in Arizona other than directly from Defendants for its own business use in commercial food preparation. By paying artificially inflated prices for Commodity Shell Eggs, Plaintiff suffered antitrust injury as a direct result of the antitrust violations alleged herein.

13. Plaintiff LL Calk Enterprises LLC d/b/a Ettore's Bakery and Restaurant is a California limited liability company with its principal place of business in Sacramento, California. During the Class Period, Plaintiff purchased Commodity Shell Eggs in California other than directly from Defendants for its own business use in commercial food preparation. By paying artificially inflated prices for Commodity Shell Eggs, Plaintiff suffered antitrust injury as a direct result of the antitrust violations alleged herein.

14. Plaintiff Elas Crepes is a California sole proprietorship with its principal place of

---

[1] *In re: Shell Eggs Antitrust Litig.*, Case MDL No. 3175, Dkt. 80 at 1 (J.P.M.L. Feb. 10, 2026).

business in Vista, California. During the Class Period, Plaintiff purchased Commodity Shell Eggs in California other than directly from Defendants for its own business use in commercial food preparation. By paying artificially inflated prices for Commodity Shell Eggs, Plaintiff suffered antitrust injury as a direct result of the antitrust violations alleged herein.

15.    Plaintiff Drago's Kitchen LLC is a Connecticut limited liability company with its principal place of business in Granby, Connecticut. During the Class Period, Plaintiff purchased Commodity Shell Eggs in Connecticut other than directly from Defendants for its own business use in commercial food preparation. By paying artificially inflated prices for Commodity Shell Eggs, Plaintiff suffered antitrust injury as a direct result of the antitrust violations alleged herein.

16.    Plaintiff House of Omelets Inc. is a Florida corporation with its principal place of business in Cape Coral, Florida. During the Class Period, Plaintiff purchased Commodity Shell Eggs in Florida other than directly from Defendants for its own business use in commercial food preparation. By paying artificially inflated prices for Commodity Shell Eggs, Plaintiff suffered antitrust injury as a direct result of the antitrust violations alleged herein.

17.    Plaintiff Tom Demo Inc. d/b/a STACKED is an Illinois corporation with its principal place of business in Oak Lawn, Illinois. During the Class Period, Plaintiff purchased Commodity Shell Eggs in Illinois other than directly from Defendants for its own business use in commercial food preparation. By paying artificially inflated prices for Commodity Shell Eggs, Plaintiff suffered antitrust injury as a direct result of the antitrust violations alleged herein.

18.    Plaintiff The Wooden Spoon at CV LLC d/b/a The Wooden Spoon is a Kansas limited liability company with its principal place of business in Overland Park, Kansas. During the Class Period, Plaintiff purchased Commodity Shell Eggs in Kansas other than directly from Defendants for its own business use in commercial food preparation. By paying artificially inflated

5

prices for Commodity Shell Eggs, Plaintiff suffered antitrust injury as a direct result of the antitrust violations alleged herein.

19.     Plaintiff 317 Moonpie Mountain LLC d/b/a Barbed Wire Café is a Michigan limited liability company with its principal place of business in Plainwell, Michigan. During the Class Period, Plaintiff purchased Commodity Shell Eggs in Michigan other than directly from Defendants for its own business use in commercial food preparation. By paying artificially inflated prices for Commodity Shell Eggs, Plaintiff suffered antitrust injury as a direct result of the antitrust violations alleged herein.

20.     Plaintiff Lauer Hospitality Group LLC d/b/a Avon Café is a Minnesota limited liability company with its principal place of business in Avon, Minnesota. During the Class Period, Plaintiff purchased Commodity Shell Eggs in Minnesota other than directly from Defendants for its own business use in commercial food preparation. By paying artificially inflated prices for Commodity Shell Eggs, Plaintiff suffered antitrust injury as a direct result of the antitrust violations alleged herein.

21.     Plaintiff SJLK Hospitality LLC d/b/a Dale's is a Mississippi limited liability company with its principal place of business in Southaven, Mississippi. During the Class Period, Plaintiff purchased Commodity Shell Eggs in Mississippi other than directly from Defendants for its own business use in commercial food preparation. By paying artificially inflated prices for Commodity Shell Eggs, Plaintiff suffered antitrust injury as a direct result of the antitrust violations alleged herein.

22.     Plaintiff McCarthy Future LLC d/b/a Varsity Inn is a New Jersey limited liability company with its principal place of business in Ocean City, New Jersey. During the Class Period, Plaintiff purchased Commodity Shell Eggs in New Jersey other than directly from Defendants for

6

its own business use in commercial food preparation. By paying artificially inflated prices for Commodity Shell Eggs, Plaintiff suffered antitrust injury as a direct result of the antitrust violations alleged herein.

23. Plaintiff J & A Restaurants LLC d/b/a Stingers Pizza Pub is a New York limited liability company with its principal place of business in Manlius, New York. During the Class Period, Plaintiff purchased Commodity Shell Eggs in New York other than directly from Defendants for its own business use in commercial food preparation. By paying artificially inflated prices for Commodity Shell Eggs, Plaintiff suffered antitrust injury as a direct result of the antitrust violations alleged herein.

24. Plaintiff LKN Cheesecakery, LLC is a North Carolina limited liability company with its principal place of business in Lincolnton, North Carolina. During the Class Period, Plaintiff purchased Commodity Shell Eggs in North Carolina other than directly from Defendants for its own business use in commercial food preparation. By paying artificially inflated prices for Commodity Shell Eggs, Plaintiff suffered antitrust injury as a direct result of the antitrust violations alleged herein.

25. Plaintiff Word of Mouth Neighborhood Bistro LLC d/b/a Word of Mouth Neighborhood Bistro is an Oregon limited liability company with its principal place of business in Salem, Oregon. During the Class Period, Plaintiff purchased Commodity Shell Eggs in Oregon other than directly from Defendants for its own business use in commercial food preparation. By paying artificially inflated prices for Commodity Shell Eggs, Plaintiff suffered antitrust injury as a direct result of the antitrust violations alleged herein.

26. Plaintiff Creative Restaurants, Inc. d/b/a Rum Boogie is a Delaware corporation with its principal place of business in Memphis, Tennessee. During the Class Period, Plaintiff

7

purchased Commodity Shell Eggs in Tennessee other than directly Defendants for its own business use in commercial food preparation. By paying artificially inflated prices for Commodity Shell Eggs, Plaintiff suffered antitrust injury as a direct result of the antitrust violations alleged herein.

27. Plaintiff Startswithone LLC d/b/a The Diner is a Wisconsin limited liability company with its principal place of business in Fond du Lac, Wisconsin. During the Class Period, Plaintiff purchased Commodity Shell Eggs in Wisconsin other than directly from Defendants for its own business use in commercial food preparation. By paying artificially inflated prices for Commodity Shell Eggs, Plaintiff suffered antitrust injury as a direct result of the antitrust violations alleged herein.

## II. DEFENDANTS

### A. Cal-Maine

28. Defendant Cal-Maine Foods, Inc. ("Cal-Maine"), is Delaware corporation with its principal place of business in Ridgeland, Mississippi. Cal-Maine is publicly traded under the ticker symbol CALM.

29. Cal-Maine was founded in 1957 as Adams Food. In 1969 it merged with Dairy Fresh Products and Maine Egg Farms to form Cal-Maine Foods. Since then, Cal-Maine has continued to aggressively acquire egg producers around the country. Cal-Maine has acquired and integrated nearly 30 companies to become the behemoth it is today. In 2024, Cal-Maine acquired three additional companies and added 5.9 million egg-laying hens to its flock.

30. Cal-Maine is the largest producer of eggs in the United States. In 2024, Cal-Maine had over 50 million egg-laying hens, and it controlled approximately 20% of national egg sales. It is a fully integrated company with its operations consisting of hatching chicks, growing and maintaining chicken flocks, manufacturing feed, and producing, processing, packaging, and distributing shell eggs. In 2024, Cal-Maine achieved sales of $2.33 billion with over 1.15 billion

dozen eggs sold.

31.     Cal-Maine has forty-nine egg production facilities in the United States, including in Alabama, Arkansas, Florida, Georgia, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Ohio, Oklahoma, South Carolina, Texas, and Utah.

32.     During the Class Period, Cal-Maine subscribed to Urner Barry, its commodity shell egg prices were tied to Urner Barry benchmarks, and it participated in the conspiracy set forth in this complaint to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail shell egg prices.

33.     During the Class Period, Cal-Maine sold Commodity Shell Eggs to members of the proposed Classes at anticompetitively inflated prices.

**B.     Rose Acre**

34.     Defendant Rose Acre Farms, Inc. ("Rose Acre"), is an Indiana corporation with its principal place of business in Seymour, Indiana.

35.     Rose Acre is the second largest egg producer in the United States. As of 2024, it had nearly 26 million egg-laying hens.

36.     Rose Acre has sixteen egg production facilities in the United States. These facilities are located in Indiana, Illinois, Missouri, North Carolina, Georgia, Iowa, and Arizona.

37.     During the Class Period, Rose Acre subscribed to Urner Barry, its commodity shell egg prices were tied to Urner Barry benchmarks, and it participated in the conspiracy set forth in this complaint to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail shell egg prices.

38.     During the Class Period, Rose Acre sold Commodity Shell Eggs to members of the proposed Classes at anticompetitively inflated prices.

9

### C.     Versova

39.     Defendant Versova Holdings, LLC, is a Delaware limited liability company with its principal place of business in Sioux Center, Iowa. Versova Holdings wholly or partially owns Trillium Farms, whose day-to-day operations are managed by Defendant Versova Management Cooperative. Through Centrum Valley Holdings and Versova Management Cooperative, Versova wholly or partially owns and manages day-to-day operations for egg-producing farms across the country, including Centrum Valley Farms, Oakdell Farms, and Willamette Egg Farms.

40.     This complaint refers to Versova Holdings, LLC and its owned, controlled, and/or affiliated entries collectively as "Versova."

41.     Versova is one of the largest egg producers in the United States. Versova has several egg production facilities in the United States, including five in Iowa. It also has facilities in Ohio, Washington, and Oregon. Versova farms include, among others, Center Fresh Group, Trillium Farms, Centrum Valley Egg Farms, and Willamette Egg Farms. In 2024, Versova and its family farms had over 35 million egg-laying hens.

42.     During the Class Period, Versova subscribed to Urner Barry, its commodity shell egg prices were tied to Urner Barry benchmarks, and it participated in the conspiracy set forth in this complaint to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail shell egg prices.

43.     During the Class Period, Versova sold Commodity Shell Eggs to members of the proposed Classes at anticompetitively inflated prices.

### D.     Hillandale Farms

44.     Defendant Hillandale Farms, Inc. is an Ohio corporation with its principal place of business in Gettysburg, Pennsylvania.

45.     Defendant Hillandale Farms of Pa., Inc., is a Pennsylvania corporation with its

10

principal place of business in Gettysburg, Pennsylvania.

46.    Defendant Hillandale-Gettysburg, LLC is a Pennsylvania limited liability company with its principal place of business in Gettysburg, Pennsylvania.

47.    Defendant Hillandale Farms East, Inc. is a Pennsylvania corporation with its principal place of business in Gettysburg, Pennsylvania.

48.    Hillandale Farms, Inc., Hillandale Farms of Pa., Inc., Hillandale-Gettysburg, LLC, and Hillandale Farms East, Inc., are all related entities, and this complaint refers to them collectively as "Hillandale Farms" or simply "Hillandale."

49.    Hillandale Farms is one of the largest egg producers in the United States. It produces approximately 38 million dozen eggs per month. In 2025, it had approximately 21 million egg-laying hens.

50.    Hillandale Farms has several egg production facilities in the United States, including in Pennsylvania and Ohio.

51.    Hillandale Farms was recently acquired by Luxembourg-based company Global Eggs for over $1 billion.

52.    During the Class Period, Hillandale Farms subscribed to Urner Barry, its commodity shell egg prices were tied to Urner Barry benchmarks, and it participated in the conspiracy set forth in this complaint to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail shell egg prices.

53.    During the Class Period, Hillandale Farms sold Commodity Shell Eggs to members of the proposed Classes at anticompetitively inflated prices.

### E.    Daybreak Foods

54.    Defendant Daybreak Foods, Inc. ("Daybreak Foods," or simply "Daybreak"), is a Wisconsin corporation with its principal place of business in Lake Mills, Wisconsin.

11

55. Daybreak Foods is one of the largest egg producers in the United States. In 2025, Daybreak acquired S&R Egg Farm (which itself had 4.85 million egg-laying hens in 2024). It produces approximately 16 million eggs per day. In 2025, it had approximately 24 million egg-laying hens.

56. Daybreak operates several egg production and processing facilities in the United States, including in Wisconsin, Iowa, Illinois, Ohio, Minnesota, and Michigan.

57. During the Class Period, Daybreak Foods subscribed to Urner Barry, its commodity shell egg prices were tied to Urner Barry benchmarks, and it participated in the conspiracy set forth in this complaint to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail shell egg prices.

58. During the Class Period, Daybreak Foods sold Commodity Shell Eggs to members of the proposed Classes at anticompetitively inflated prices.

### F. Opal Foods

59. Defendant Opal Foods, LLC ("Opal Foods" or "Opal") is a Delaware limited liability company with its principal place of business in Neosho, Missouri.

60. Opal Foods' operational history, with roots in Missouri, traces back to 1957, when Hollis Osborne founded MOARK Eggs, which ultimately became the third-largest producer of specialty and Commodity Shell Eggs in the United States. In 2000, Osborne merged the MOARK Eggs business with Land O'Lakes, and later sold his remaining ownership interest in 2005. In May 2014, MOARK's Midwest egg-production assets were sold to a newly formed entity known as Opal Foods, LLC.

61. Opal Foods, LLC was formed by the agricultural investment firm AGR Partners, in strategic partnership with two established egg producers: Rose Acre Farms, Inc., based in Indiana, and Weaver Brothers, also known as Weaver Eggs, based in Ohio.

12

62. In October 2020, Rose Acre Farms and Weaver Eggs acquired AGR Partners' full ownership interest, resulting in Opal being jointly owned by only Rose Acre and Weaver Eggs.

63. Opal produces conventional and cage-free eggs. It is a franchisee of Eggland's Best, supplies Land O'Lakes All-Natural Brown Eggs, and was one of the eight original producer-members of ProEgg, an egg-farmer cooperative serving thirteen western states.

64. Rose Acre and Weaver board designees jointly oversee Opal while both continue to produce and market eggs themselves. In fact, when Rose Acre and Weaver combined to purchase AGR Partner's interest in the business, Opal's board chair publicly framed the transaction as an alignment of Opal's culture "with the family business philosophy of its owners"—the Rust family (Rose Acre) and the Weaver family. Since then, Opal has been operated as a quasi-independent company with its own management team, while representatives of Rose Acre and Weaver "continue to serve on the Board and provide governance and oversight for the business."

65. In March 2024, Opal Foods acquired the egg operations of Sparboe Farms. The merger united Opal's laying farms, pullet farms, feed mills, and processing operations in Missouri, Colorado, and Iowa  with Sparboe's shell-egg farms in Minnesota, Iowa, and Colorado.

66. The merger combined Opal's flock of 7 million hens with Sparboe's 5 million hens for a total approximate flock size of 12 million.

67. During the Class Period, Opal subscribed to Urner Barry, its commodity shell egg prices were tied to Urner Barry benchmarks, and it participated in the conspiracy set forth in this complaint to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail shell egg prices.

68. During the Class Period, Opal sold Commodity Shell Eggs to members of the proposed Classes at anticompetitively inflated prices.

**G.    Urner Barry**

69.    Defendant Urner Barry Publications, Inc., is a New Jersey corporation with its principal place of business in Toms River, New Jersey. Urner Barry published egg prices to industry participants, including the Egg Producer Defendants, during the Class Period.

70.    Since 1976, Urner Barry has hosted an annual "Executive Conference" (originally in New Jersey, more recently in locales like Las Vegas), which is today the most widely attended and recognized marketing event in the poultry and egg industries.

71.    Urner Barry publishes its benchmark egg prices through an online database called Comtell On-Line ("Comtell"). Urner Barry claims that Comtell is "the most accessible, accurate and timely source for news, quotes and research" in the meat, poultry, pork, veal, seafood, and egg industries. Comtell subscribers "are updated several times a day on the most impactful market conditions."

72.    Urner Barry was previously a subsidiary of AgriBriefing Limited. In 2023, U.K.-based Mintec Group acquired AgriBriefing in a deal that included Urner Barry. Like Urner Barry, Mintec is a provider of market intelligence and price data. In 2024, the Mintec Group consolidated all of its operations under a single brand name: Expana.

**H.    Egg Clearinghouse**

73.    Defendant Egg Clearinghouse, Inc. ("ECI"), is a Delaware corporation with its principal place of business located in Dover, New Hampshire.

74.    During the Class Period, ECI operated as an online spot market that allows participants to place bids on eggs listed for sale and see the results of trades.

75.    Only ECI members (*i.e.*, farmers and egg buyers) are allowed to trade on the ECI marketplace.

76.    In 2024, 2.6 billion eggs and 39 million pounds of egg products, valued at more

than $600 million, were traded on the ECI online platform.

77.     ECI represents just 5% of the shell egg market, but plays an outsized role in how eggs are priced nationwide, including through its direct impact on Urner Barry benchmark prices.

78.     ECI was a key tool used by conspirators to anticompetitively inflate Urner Barry benchmark prices and through them, wholesale and retail shell egg prices. ECI's structural vulnerabilities—designed into the market by its creators and managers, the nation's largest egg producers—assisted the conspirators in carrying out their anticompetitive scheme.

## I.     Unnamed Co-Conspirators and Other Non-Parties

79.     Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants and have performed acts in furtherance of the illegal conduct described in this complaint. Defendants are jointly and severally liable for the acts of these unnamed co-conspirators.

80.     The anticompetitive and unlawful acts alleged against the Defendants in this Complaint were authorized, ordered, or performed by Defendants' respective officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' businesses or affairs.

81.     Whenever reference is made in this complaint to any act of any corporation, company, association, or other business entity, the allegation means that the entity engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

82.     Each entity Defendant's agent operated under the authority and apparent authority of its respective principals.

83.     Each entity Defendant, through its respective subsidiaries, affiliates, and agents,

15

operated as a single unified entity.

84. Each Defendant acted as the principal or agent of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

85. When this complaint refers to a corporate family or companies by a single name in its allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all the Defendant entities within that family. Because Defendants market themselves as corporate families, individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they recognize the distinction between the entities within a corporate family. Thus, all Defendant entities within the corporate families were active, knowing participants in the conspiracy to maintain supracompetitive prices of Commodity Shell Eggs.

86. Defendants are also liable for acts done in furtherance of the alleged conduct by companies they acquired through mergers and acquisitions.

## FACTUAL ALLEGATIONS

I. **The U.S. Egg Industry**

A. **Egg Production and Supply Dynamics**

87. Eggs are a fundamental staple in U.S. kitchens. The U.S. Department of Agriculture has recognized eggs as "among the most nutritious foods on earth." Similarly, the American Heart Association describes eggs as "an efficient, rich source of protein and vitamins" that supports healthy metabolism, liver function, and fetal brain development.

88. Thanks to their high nutritional value and versatility in cooking, eggs remain an essential part of U.S. households. Both overall and per capita egg consumption has steadily risen over the past decades, with the average American estimated to consume approximately 273.6 eggs

16

in 2026.[2]

89.     The U.S. egg industry produces about over 100 billion eggs each year. According to an industry analyst, the egg market in the United States is worth approximately $10 billion annually. The overwhelming majority of eggs produced—about 70 percent—are sold as whole "shell eggs" or "table eggs" at retail or food-service outlets; the remainder are broken and sold as liquid, frozen, or dried "egg products."

90.     Approximately 88 percent of shell eggs sold in the United States are either conventional or cage-free eggs—referred to in this complaint as "Commodity Shell Eggs"—and sold at prices benchmarked by a single, private firm, Urner Barry. These types of eggs are sold as commodities within particular USDA sizes, grades, and colors, and are priced daily by region by Urner Barry, in distinction to free-range and pasture-raised eggs, which are not priced by Urner Barry. In some parts of the country, most notably California, all shell eggs must be "cage-free" by law, and Urner Barry's benchmark prices—which track California as a separate "cage-free" region—reflect this.

91.     In shell egg markets, the chicken comes before the egg—a supply of specialized hens, and related poultry production facilities, is required for egg production. Poultry production starts with primary breeder flocks, whose eggs hatch into egg-laying hens (layers). Hens grow on pullet farms before moving to egg production facilities.

92.     The egg production cycle is stable and predictable, which allows large producers to precisely calibrate future supply. Once a pullet is placed, her productive output follows a fixed biological trajectory: a flock begins producing eggs at 18 to 22 weeks of age, reaches peak

---

[2]     https://www.statista.com/statistics/183678/per-capita-consumption-of-eggs-in-the-us-since-2000/?srsltid=AfmBOooZH5CYoDxw_b1Yee-1jPJKE-txllGH-HgJK74rDbcup5aFkAS9 (underlying source is USDA).

production of approximately 90 percent at 30 to 32 weeks,[3] and declines to around 50 percent by 60 to 70 weeks. The majority of hens are removed from production between 100 and 130 weeks and replaced immediately by mature pullets, creating a continual cycle of renewal. Because this biological cycle is fixed and predictable, producers can forecast their further supply months in advance: reducing the number of pullets placed today predictably shrinks supply six to eight months later.

93.     Producers also control the timing of supply through two additional levers. First, induced molting allows a producer to halt a flock's egg production for approximately 10 weeks at will, by withdrawing feed and controlling light exposure, after which the flock returns to production. Second, cold storage allows producers to hold packaged eggs for up to 45 days before shipment, withholding supply from the market when prices are low and releasing it when prices rise.

94.     Eggs are produced nationwide, with most states contributing significantly. Production in the United States is concentrated in the Midwest. The top five egg producing states— Iowa, Ohio, Indiana, Pennsylvania, and Texas—represented approximately 42 percent of all laying hens in 2024.

### B.     Commodity Shell Eggs Are Fungible

95.     The overwhelming majority of shell eggs produced in the United States are either conventional or cage-free, sold as fungible commodities through retail or food service channels. These types of eggs account for approximately 88 percent of all shell eggs sold in the United States. They consist of standard white or brown eggs produced in non-specialty systems that comply with applicable hen housing requirements, whether conventional systems in most states or cage-free in

---

[3] That is, on any given day, approximately 90 out of 100 hens in the flock will lay an egg.

states such as California. These eggs are sized and graded according to USDA-defined standards, are sold as baseline, Commodity Shell Eggs in retails and foodservice channels for a particular region, are priced by Urner Barry, and are overwhelmingly sold at prices based on an Urner Barry benchmark.

96.     In contrast, a smaller but expanding share of United States shell eggs consist of more specialized or "quality-differentiated types," including organic, free-range, and pasture-raised egg products. These non-commodity eggs represent a minority of total production but command higher prices due to their animal-welfare, environmental, or certification attributes. Commodity Shell Eggs remain the industry's core product and account for most U.S. egg sales.

97.     According to United Egg Producers ("UEP"), in 2025, over half of the eggs produced in the United States were sold as shell eggs through retail outlets, about 31% were processed into egg products, and almost 12% were sold through food service channels such as restaurants. Less than 2% of United States eggs produced in 2025 were exported.



98.     Conventional and cage-free shell eggs function as a classic commodity product

because they are highly interchangeable, within uniform grade, size, color, and regional guidelines. The U.S. government, through the U.S. Department of Agriculture ("USDA"), has established a uniform grading and sizing system. USDA Consumer Grades, such as Grade AA, Grade A, and Grade B, are based on specific interior and exterior quality factors. Similarly, sizes are standardized by weight per dozen, including Jumbo, Extra Large, Large, Medium, and Small. These government-mandated standards strip away most avenues for product differentiation. A "Grade A Large" egg from one producer is, for all practical purposes, identical to and perfectly substitutable with a "Grade A Large" egg from any other producer. Similarly, regional cage-free standards—principally California's—establish a standardized animal welfare baseline for which all eggs sold in the state must comply.

99.   As sellers of interchangeable commodity products within particular size, grade, color, and regional guidelines, conventional and free-range egg producers compete almost entirely on price. Because government standards eliminate meaningful differences in quality or characteristics, producers have historically operated in a low-margin, volume-driven market. For decades, the industry followed a predictable pattern: thin but stable profits, with little opportunity for any producer to command a premium.

100.   However, in recent years, the United States egg market has undergone a structural overhaul. Producer consolidation, vertical integration of the largest producers, and economic interdependence through co-branding, joint ventures, and producer-to-producer trading have created a modern egg industry ripe for collusion. And the fact that nearly every commodity shell egg sold in the United States is priced by a single, private entity with a vulnerable pricing methodology created the means for such collusion to inflate egg prices nationwide.

101.   That is what happened during the Class Period, which saw an abrupt and significant

break from the traditional low-margin model as egg producers' profits skyrocketed alongside inflated prices—an outcome inconsistent with how a truly competitive commodity market should behave.

### C.     Consolidation in the Egg Industry

102.     Throughout most of the twentieth century the United States egg industry was highly fragmented, with thousands of independent farms. Since the 1980s, however, the industry has undergone aggressive consolidation. Between 1986 and 2002 the number of United States shell egg producers fell from 2,500 to just 700, and consequently the size of egg producing farms grew. In 1982 half of all egg-laying hens lived on farms with 62,000 hens or less, but by 2012 half of all egg-laying hens lived on farms with 925,000 hens or more. Then between 2012 and 2017, the egg industry consolidated even further as the number of egg farms fell by another 17 percent. More recently, and in 2023 alone, Cal-Maine acquired Fassio Egg Farms, Daybreak acquired Hen Haven LLC and Schipper Eggs LLC, and MPS Egg Farms (the sixth largest egg producer) acquired Country Charm.

103.     Today, Cal-Maine, Rose Acre, Versova, Hillandale Farms, and Daybreak Foods (referred to in the industry as the "Big Five") collectively control approximately half of all U.S. laying hens. Defendant Cal-Maine alone had over 50 million egg-laying hens in 2025, and it controlled approximately 20 percent of national egg sales. Industry analysts expect consolidation to continue. Indeed, in its investor presentations and earnings calls, Cal-Maine boasts of pursuing more acquisition strategies.

104.     The larger of the Egg Producer Defendants are also vertically integrated—they own breeder flocks, operate multiplier and pullet farms, manufacture feed, run in-house grading and breaking facilities, and maintain dedicated trucking fleets.

105.     In addition to its 50 million layers and forty-nine egg production facilities, Cal-

Maine hatches the majority of its chicks in its own multiplier farms and grows them in its own pullet farms. When they reach egg-laying age, Cal-Maine transports them to its own production farms (~90%) or contracted farms (~10%), where they are given feed from Cal-Maine's own feed mills. After eggs are produced, Cal-Maine cleans, grades, and packages them at its own packing facilities for sale as shell eggs or breaks and transforms them into liquid, frozen, or dried form at its own processing facilities for sale as egg products. Finally, Cal-Maine prepares its table-eggs and egg products to be picked up by customers or ships them to customers' warehouses and retail stores with its own fleet of delivery trucks, or with contracted trucks.

106. Cal-Maine's vertical reach extends even further: it maintains its own 10 million-bird breeder program, giving it leverage over the replenishment stock needed by rivals that lack comparable breeding capacity. In a 2020 investor presentation, Cal-Maine touted that "[f]rom hatching to production, our facilities are capable of producing and processing 6.6 million eggs per hour." Defendant Rose Acre similarly maintains its own breeder flock. This vertical integration into pullet breeding means that Cal-Maine's and Rose Acre's decisions to slow-walk flock restoration during the Class Period as detailed below were not constrained by pullet availability. Both had the physical capacity and the biological infrastructure to replenish their flocks at a competitive rate. Their failure to do so was a choice, not a compulsion.

107. Moreover, independent producers without breeder flocks must source replacement pullets either from Cal-Maine and Rose Acre or from a two-firm genetics duopoly—Hendrix Genetics and EW Group—narrowing resupply options and creating a dependence among smaller producers upon the largest producers for the very existence and continuity of their business. This structure gives the dominant vertically integrated producers a structural advantage over their smaller competitors: when Cal-Maine and Rose Acre choose not to expand their own flocks, they

22

simultaneously reduce the commercial pullet supply available to independent producers who depend on them as a source.

108. As a result, smaller companies do not have the ability to rebuild their flocks as quickly as the most dominant firms, and when they do seek to rebuild their flocks, they may depend on Cal-Maine and Rose Acre for new additions.

109. And vertical integration at the top of the U.S. egg industry creates economic reliance and interdependence among small producers in other ways as well. Because the vertically-integrated Big Five producers maintain large processing, packaging, transportation, storage, and trading components, smaller egg producers may rely on the largest producers to process their eggs, bring them to market, or even purchase them for resale to large wholesalers. Similarly, the largest producers engage in co-branding, joint ventures, and producer cooperatives with smaller producers across the country. As a result, an egg-producing cartel with a significant national market share (as in this case) has outsized influence against would-be mavericks or price-cutters even beyond the near-uniform dominance of the Urner Barry pricing benchmark.

110. And even within layer egg stocks, egg producers can and do opportunistically control egg supply, including through induced molting.

**D.      How Shell Eggs Are Priced: The Urner Barry Benchmark and ECI**

111. Because Shell Eggs are a commodity without a public, regulated exchange, virtually all wholesale pricing in the industry is anchored to a single source: the daily price quotations published by Defendant Urner Barry.

112. Egg producers, including the Egg Producer Defendants, sell the substantial majority of their Commodity Shell Eggs to retailers, restaurants, and food service distributors under contracts that price eggs by reference to Urner Barry's daily quotations—either as the quotation itself or as the quotation plus or minus a fixed adjustment. Cal-Maine's SEC filings state that most

conventional and cage-free shell eggs in U.S. retail and food service channels are priced based on quoted wholesale market prices like those from Urner Barry.

113.   Because these formula-priced contracts govern approximately 95 percent of the shell eggs sold in the United States, Urner Barry's daily quotations are, as the U.S. Department of Justice has put it, "an inseparable part of the price" that most retailers and other buyers pay for eggs. Therefore, even small movements in the daily Urner Barry quotation reprice billions of eggs already committed under existing contracts.

114.   Urner Barry is a price reporting agency that analyzes, aggregates, and anonymizes market information to publish daily price quotations for the egg industry. Urner Barry publishes these quotations across six U.S. regions—the Northeast, Southeast, Midwest, Northwest, California, and South Central—and across egg sizes such as Extra Large, Large, and Medium. Although published separately, Urner Barry's regional quotations are highly correlated, such that a change affecting one region typically affects the others.

115.   For example, as shown below, comparing the Urner Barry Northeast Price Report with the Midwest Report for late-March and early-April 2020 demonstrates the same stark rise (and fall) in shell egg prices.

24



**Wholesale egg prices in the U.S. are down some 50% since peaking in December 2022**

Weekly price of a dozen eggs since 2019

Note: Reflects the Midwest Large White Egg benchmark

116.   Indeed, as shown below, the Urner Barry Price Reports for the Northeast, Southeast, and Midwest had a tight spread in the price per dozen for Grade A Large White Shell Eggs between March 27 and April 2, 2020.

| Date | Urner Barry Price Quote | | |
|------|-----------|-----------|---------|
|      | Northeast | Southeast | Midwest |
| 3/27/2020 | $ 3.13 | $ 3.18 | |
| 3/30/2020 | $ 3.13 | | $ 3.03 |
| 4/2/2020 | $ 3.03 | | |

117.   ECI supplies many of the trades, bids, and offers used by Urner Barry to determine its benchmark prices. ECI is the sole organized spot market for shell eggs in the United States—a members-only electronic platform on which producers and buyers post offers, place (purportedly) blind bids, and execute trades, activity that ECI itself describes as the market's trading levels. Although ECI accounts for less than 5 percent of national shell egg transactions by volume, it is not a peripheral data point: Urner Barry explicitly incorporates ECI trade, bid, and offer data into its daily quotations, and ECI represents that its "trading levels . . . help determine prices on the wholesale level." A producer's bid, offer, or trade on ECI is therefore not simply a transaction

25

between private parties; it is, by design, a direct input into the benchmark that governs nearly every other shell egg contract in the country.

118.    Urner Barry's methodology, while facially neutral, is structurally vulnerable to coordinated manipulation by a small number of dominant producers such as Egg Producer Defendants.

119.    Urner Barry's benchmark-setting mechanism is particularly vulnerable to sustained and coordinated manipulation by the industry's largest participants—and they have in fact manipulated that benchmark, injuring competition and raising egg prices, as explained below.

## II.    Anticompetitive Conduct

120.    For many years, the U.S. egg industry typically saw stable prices with mild fluctuations, but since consolidating in the 1980s and 1990s, it has become less cyclical and more rigid in production. During the course of the Class Period, Defendants broke the industry's longstanding pattern and increased egg prices to record highs, reaching $6.23 per dozen in March 2025 before an immediate collapse after a Department of Justice price-fixing investigation was revealed.

121.    Egg Producer Defendants claim HPAI outbreaks since late 2021 caused egg price increases, but the price inflation over the Class Period exceeds—in both magnitude and stability—what bird flu losses alone would explain. Moreover, direct evidence now makes clear that the Class Period price inflation was indeed artificial—several of the nation's major egg producers conspired to manipulate commodity shell egg pricing benchmarks, leading to higher prices for retailers, restauranteurs, and consumers.

122.    The Defendants' conspiracy operated on two reinforcing tracks. The first track— coordinated manipulation of the Urner Barry benchmark through self-reporting and influence over ECI—was the primary engine of the price spike. Because approximately 95 percent of all shell

egg contracts are pegged directly to the Urner Barry quotation, even modest artificial increases in reported prices cascade immediately and automatically into higher prices for nearly every downstream transaction.[4] The HPAI outbreak did not cause those inflated reports; Defendants used the outbreak as a pretext to justify benchmark prices that far exceeded what any genuine supply disruption could explain.

123.    The second track—coordinated output restriction—was the conspiracy's enforcement mechanism, but not its cause. In a competitive market, artificially elevated prices would attract new entry and additional supply, driving prices back toward competitive levels. The Egg Producer Defendants short-circuited that corrective force by collectively refraining from rebuilding flocks at the rate that competitive incentives and their own financial self-interest would otherwise demand. The supply restriction was not large enough to explain the price spike on its own. But it was large enough, and sustained long enough, to prevent prices from self-correcting. In short: Defendants manufactured a story of scarcity to inflate the benchmark, and then made just enough of that scarcity real to keep prices from collapsing.

A.    **Defendants Conspire to Inflate the Price of Commodity Shell Eggs**

1.    Defendants Coordinated Bidding and Reporting Practices to Manipulate the Urner Barry Benchmark

124.    The Urner Barry benchmark heavily relies on a small number of dominant producers' self-reported bids, trades, and market "assessments," filtered through the subjective

---

[4] The existence of a benchmark pricing system does not immunize coordinated price fixing especially where, as here, competitors join efforts to influence the benchmark, raise prices in lockstep, and simultaneously take action to ensure the benchmark remains elevated. The Urner Barry price report itself was the mechanism for Defendants' collusion, allowing Defendants to jointly target supracompetitive prices. Courts have noted that benchmarks reliant on submission by industry participants are susceptible to coordinated influence and can be vehicles for price-fixing. *See Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 771 (2d Cir. 2016). That is precisely what occurred among the Egg Producer Defendants during the Class Period.

judgment of a handful of Urner Barry reporters and editors and anchored day-to-day to the prior day's quotation. This structure gave the Egg Producer Defendants both the means and the opportunity to move the national egg benchmark using a common and repeated playbook: agreeing that multiple producers would bid so that a diverse set of market participants appeared to be driving the market; agreeing to submit large numbers of bids in the hours before Urner Barry's daily publication; submitting bids that were never intended to result in an executed trade; executing off-exchange transactions at above-market prices for the specific purpose of giving Urner Barry a transaction "to hang its hat on"; and directly lobbying Urner Barry's reporters to secure a higher published quotation. Evidence of Defendants' manipulation of the Urner Barry index was recently disclosed through the complaint filed by the United States Department of Justice and several state attorneys general. *See United States, et al. v. Cal-Maine Foods, Inc., et al.*, No. 5:26-cv-04060 (N.D. Iowa June 29, 2026), Dkt. 1 ("Government Complaint").[5]

> (i)    Executing Premium Trades to Give Urner Barry Reporters Something "To Hang [Their] Hat On"

125.    Urner Barry's hierarchy places completed, bona fide trades at the top of the information it considers, and net-short Defendants' routine need to purchase eggs from their competitors gives inter-Defendant trades a built-in appearance of ordinary commercial activity. Defendants exploited both features, arranging trades with one another and placing trades on- or off-ECI at inflated prices for the specific purpose of giving Urner Barry's reporters completed transactions to point to in justifying a higher quotation.

126.    For example, on August 7, 2023, a Cal-Maine executive sent a text message to a Versova executive asking, "[a]ny more eggs?" and noting that Urner Barry's market reporter "needs premium trades to hang her hat on." The Cal-Maine executive then proposed to buy eggs

---

[5] The Government Complaint is appended to this complaint as Exhibit A.

at premium prices, and the two negotiated the delivery date of the trade. Cal-Maine and Versova went on to execute three private trades—*i.e.*, trades not executed on ECI or a similar platform—at premium prices, and Cal-Maine shared the resulting purchase orders directly with Urner Barry. Urner Barry had kept its price quotations for white, large, shell eggs unchanged across all regions except California since May 26, 2023; it then increased those quotations across all regions except California on each day between August 9 and August 11, 2023. On August 9, 2023, the CEO of a large egg cooperative forwarded Urner Barry reports to Cal-Maine and wrote, "[f]inally!!!!"

127.   Other Defendants also coordinated premium producer-to-producer trades during this time period. The Egg Producer Defendants' pattern of coordinated trading, paired with coordinated Urner Barry communications, continued into late 2024 and at least through March 2025, when the Department of Justice publicly announced that it had begun a price-fixing investigation targeting U.S. egg producers.

128.   The inter-defendant trades, however, were only one of the tactics deployed within the Defendants' conspiracy to manipulate Urner Barry benchmarks and ultimately, wholesale and retail shell egg prices during the Class Period.

(ii)   Coordinating the Timing, Volume, and Direction of Bids to Push or Hold the Benchmark ("Bidding Early and Often")

129.   Defendants also coordinated the timing and volume of the bids they placed on ECI, submitting large numbers of bids in a short window—including bids that were never intended to result in an executed trade—so that Urner Barry's reporters would observe what appeared to be broad-based, diverse bidding activity and adjust benchmark prices accordingly. Defendants used this same coordinated bidding both to push the benchmark upward and, at other times, to hold it steady against a decline.

130.   On the morning of October 14, 2022, a Cal-Maine executive texted Hickman's

CEO: "We are bidding up. Let's hold it today." Later that day, Hickman's CEO called a then-Cal-Maine executive by phone. By the end of the day, Hickman's and Cal-Maine's bids on ECI accounted for over half of all bids submitted that day, and Urner Barry kept its price quotations for white, large, shell eggs unchanged across all regions. A Cal-Maine executive then texted Hickman's CEO, "[n]o change," acknowledging that, as they had intended, Urner Barry had kept its quotations the same. During this same time period, other egg producers also pressured Urner Barry to hold egg prices steady or increase them.

131. In December 2022, when egg prices were at rapidly-inflated levels, egg producers coordinated to push them up yet further. For example, on December 19, 2022, following a regularly scheduled weekly call among Cal-Maine, Versova, and Hickman's, Hickman's CEO emailed the group: "[n]eed to push the spread into the northwest…." A senior Versova executive replied a few hours later that "[o]ur team will be bidding for additional loads again tomorrow." Hickman's CEO responded, "[i]f we all bid in our respective areas for the 3-5 loads minimum we are short . . . the market reporters will have to address," and the group continued discussing the plan by phone throughout the day. That same day, Urner Barry increased its price quotations for white, large, shell eggs across all regions.

132. Hickman's CEO repeated his request to push up egg prices by coordinated bidding on December 20, 2022 emailing senior executives at Cal-Maine, Versova, and others: "[p]lease consider posting strong bids, early and often. The market reporters don't get in for another hour, so it will be good for them to see diverse bidding upon logging on." He followed up shortly after: "[h]urry[.] There are only 16 bids on ECI right now and 15 of them are ours." Within minutes, Cal-Maine, Versova, and Hickman's collectively submitted dozens of bids, most at premium prices; Hickman's CEO then had several phone calls with executives at Versova and Cal-Maine.

Urner Barry again increased its quotations for white, large, shell eggs across all regions on December 20.

133.   On December 21, 2022 Hickman's CEO emailed senior executives at Cal-Maine, Versova, and ProEgg warning that Urner Barry's market reporter was "trying to set the stage for [market prices] to retrace" and instructing the group to "bid openly for eggs, especially mediums and eggs into the northwest." Consistent with that instruction, Cal-Maine, Versova, and Hickman's collectively submitted dozens of bids that morning, and Urner Barry increased its quotations for white, large, shell eggs across all regions that day as well.

134.   The same day, when Urner Barry's own report later noted that bidding volume had declined from the prior day, the CEO of an egg cooperative wrote that Urner Barry was "prepared to pull the market down," and joined Hickman's CEO in urging the group: "[a]s a group we need to bid like they vote in Chicago, early and often." Hickman's CEO called a now-former Cal-Maine executive three times throughout the day. Hickman's CEO repeated the instruction the next morning, emailing senior executives from Cal-Maine, Versova, the egg cooperative, and others, under the subject line "bids," stating "[t]here is only a 2 cent premium for NW [Northwest] large over SC [South Central] large" eggs; "[b]id early and often today."

135.   Following that directive, on December 22, 2022 a senior Versova executive instructed another Versova executive to "light up the northwest bids please, .02 over"—*i.e.*, two cents above Urner Barry's then-current Northwest quotation—and that executive placed bids accordingly. When one Versova executive later noted that the "NW bids are getting hit" (meaning a seller was offering to sell eggs to meet the bid), the other stated that he should delete the bids, indicating Versova did not actually need the eggs.

136.   That same day, Cal-Maine, Versova, and Hickman's collectively submitted dozens

of bids on ECI, and Urner Barry increased its quotations across all regions, including the Northwest. Hickman's CEO circulated the resulting Urner Barry report to the group, noting that "[e]gg prices [were] hitting records," and adding, "great job in the northwest today!"

137. This pattern continued across the Class Period, including in late 2024. In the afternoon on December 3, 2024, Hickman's CEO spoke by phone with executives from Cal-Maine and Versova. Early the next morning, December 4, 2024 a former Cal-Maine CEO texted Hickman's CEO: "[l]et it rip." After that, Defendants significantly changed their bidding behavior: they submitted more bids per day, and a greater percentage of their bids were at premium prices and went unfilled.

138. Defendants continued to lobby Urner Barry through the 2024 holiday season for ever-higher quotations, including by asking Urner Barry to place less emphasis on transactions by non-Defendants that could have pulled quotations down.

(iii)     Directly Lobbying and Pressuring Urner Barry Personnel

139. Beyond bidding and trading activity, Defendants also exerted direct pressure on Urner Barry reporters and editors—by phone, voicemail, and in personal communications—urging them to adopt higher quotations and to incorporate Defendants' inflated or otherwise manipulative transactions in the daily spot price.

2.     Defendants Used HPAI as a Pretext and Deliberately Slowed Flock Recovery to Sustain an Artificial Supply Shortage

140. Defendants publicly blamed unprecedented egg price increases on the 2022 outbreak of Highly Pathogenic Avian Influenza ("HPAI"). While the outbreak itself was real, Defendants exploited it as a pretext to create the false appearance of a nationwide egg shortage. The magnitude, duration, and pattern of the price spikes during the Class Period cannot be explained by the actual impact of HPAI. Instead, USDA data, industry filings, and

contemporaneous reporting show that Defendants used the outbreak as cover to impose prices far above what any genuine supply disruption could justify—and then collectively slowed the restoration of their flocks to prevent prices from naturally correcting.

141. The actual impact of HPAI on egg production was far more limited than Defendants claimed. USDA data shows that the monthly U.S. egg-laying flock in 2022 never fell more than 6.7 percent from its five-year average, and monthly egg production never fell more than 5.6 percent. In the month preceding the first detection of HPAI in commercial flocks, national retail egg inventories were 22 percent above the four-year average. And crucially, per capita egg production in the United States has not fallen below per capita egg consumption in any year between 2022 and 2025—meaning there was no actual nationwide shortage of eggs during the Class Period.

142. Nevertheless, Defendants invoked the avian flu outbreak as a pretext to manufacture a false sense of scarcity. An Urner Barry analyst hinted that the real reason for high prices was that egg producers were relying on the "psychology" and the public's awareness of the flu outbreak, rather than simply economics, and were "confident about the value they can offer to the market."

143. To maintain their manufactured false sense of scarcity and sustain artificially inflated egg prices, Egg Producer Defendants slowed the restoration of the flocks lost to avian influenza in a concerted fashion, despite having both the capability and the economic incentive to replenish production quickly.

144. In a competitive market, when prices surge, producers have a strong incentive to ramp up production quickly. They want to capitalize on high prices before supply rebounds and drives prices back down. This rapid response mechanism helps stabilize markets over time, as

higher profits encourage more output, which eventually balances supply and demand.

145. The U.S. egg industry is particularly well-positioned to respond rapidly to avian influenza outbreaks. Over decades, producers have developed a standardized, efficient protocol for depopulation, disposal, cleaning, disinfection, and repopulation. Once an outbreak is confirmed, the affected facility is quarantined and the response begins immediately. A recent example illustrates the speed of this process:

| | |
|---|---|
| March 12 | Infection officially confirmed |
| March 13 | Depopulation of 47,653 hens completed |
| March 20 | Disposal completed |
| April 2 | Cleaning of premises completed |
| April 4 | Disinfection of premises completed |
| April 20 | Quarantine lifted |

146. In that case, the producer returned to normal operations in roughly six weeks—demonstrating that rapid recovery is not only possible but routine.

147. Historical experience confirms this pattern. During the 2014–2015 HPAI epidemic, producers lost more than 35 million hens. Yet the industry fully replenished its flocks within eight months. Prices initially spiked due to the supply shock, but as producers rebuilt their flocks, egg production rebounded sharply. By 2016, prices had fallen to levels even lower than before the outbreak.

148. Egg producers themselves acknowledge this dynamic. As Cal-Maine has stated, "in the past, during periods of high profitability, shell egg producers have tended to increase the number of layers in production . . . which generally has caused a drop in shell egg prices until supply and demand return to balance."

149.    During the Class Period, however, Defendants did the opposite. Rather than restoring production as competitive market forces required, Defendants collectively slowed it. Their coordinated restriction on output prevented the national egg-laying flock from returning to its pre-outbreak level of roughly 330 million hens, even as prices remained historically high.

150.    The sluggish recovery was not the result of increased culling during the HPAI outbreak. Instead, it stemmed from Defendants' collective refusal to expand the placement of fertilized eggs into incubators and to increase the hatching of chicks. By holding back on these essential steps, Defendants choked off the supply of new layers and ensured that flock growth remained stagnant.

151.    The data affirms that this was abnormal behavior. Since 2022, the monthly decline in the egg-laying flock has mirrored the losses seen in 2015—when the HPAI outbreak wiped out 43 million hens. Yet despite similar flock reductions, prices since 2022 have risen more than three times more per hen lost than during the earlier epidemic. The only meaningful difference is Defendants' concerted effort to manipulate market pricing, as detailed above, and their coordinated refusal to rebuild supply at the pace the market would ordinarily dictate.

152.    During the Class Period, instead of increasing pullet placements to capitalize on record-high prices, Defendants added roughly 20 million fewer pullets—even though breeders and hatcheries were producing more fertilized eggs and production costs had fallen significantly since 2022. This deliberate slowdown ran directly counter to each producer's individual economic incentives. By collectively restraining the rebuilding of their flocks, Defendants manufactured the appearance of an ongoing egg shortage and insulated their artificially inflated prices from the normal corrective pressure of increased supply.

**B.     The Historically High Price of Commodity Shell Eggs Cannot be Explained by Market Forces**

153.     Defendants' conspiracy caused egg prices to rise to unprecedented highs. The wholesale price of Grade A Large White Shell Eggs—as reported by the Federal Reserve and mirrored in the Urner Barry Egg Index—jumped from roughly $0.50–$1.30 per dozen in 2021 to $1.50–$5.00 per dozen in 2022. This represents an extraordinary increase of approximately 200 to 285 percent in a single year. Although prices briefly moderated in 2023, they began climbing again by August 2024, reaching $3.00–$6.00 per dozen by the end of that year. By March 2025, the national weekly egg price index hit an all-time high of approximately $8.00 per dozen.



154.     Defendants and other industry participants have claimed that the market forces of consumer demand, increasing input costs, and bird flu are what caused price inflation across the Class Period. But publicly available data, including data from Defendants, confirms that these market forces, taken together, do not explain the dramatic rise in commodity shell egg prices during the Class Period.

155.     Rather, during the Class Period the price of Commodity Shell Eggs rose much more sharply than competitive market forces would otherwise sustain. This divergence between observed commodity shell egg prices and market fundamentals during the Class Period is more

36

consistent with a coordinated effort to artificially inflate benchmark pricing and restrict supply than it is with independent, self-interested business decision making. And previously non-public information, including direct evidence of coordinated bid-rigging and benchmark manipulation by the Egg Producer Defendants, makes pellucidly clear that price inflation in the Class Period was artificial—driven by an anticompetitive conspiracy—rather than natural.

1.    The sharp rise in egg prices since 2022 cannot be explained by Avian Flu

156.    Defendants have blamed the spread of HPAI for higher egg prices. In reality, however, HPAI does not explain the unprecedented surge in egg prices.

157.    The pretextual nature of the avian flu excuse is evident, as this was not the first time the egg industry had been hit by a large bird flu outbreak. The reduction in the egg-laying flock size of 43.3 million was similar to that in 2015, when avian flu killed 43 million egg-laying hens.

158.    Nevertheless, prices over the Class Period rose ***more than three times*** more per lost hen than they did during the earlier outbreak.

159.    Data from the USDA National Agricultural Statistics Service (NASS) and U.S. Bureau of Labor Statistics (BLS) Consumer Price Index Average Data for a dozen large eggs, as shown in the figure below, demonstrates the staggering price differences between the 2015 and 2022 outbreaks, and shows that the dramatic price hikes that began at the onset of the 2022 HPAI outbreak occurred in the face of relatively stable egg production compared to the more severe and prolonged shortage in 2015.



160.    Average wholesale egg prices compared to egg-laying hen inventory lend further support to the conclusion that Defendants used HPAI as a pretext to justify their coordinated pricing activity during the Class Period as, despite relatively stable inventory, wholesale egg prices have soared compared to those in 2015.



161.    Indeed, the actual decline in domestic supply from HPAI during the Class Period was even smaller than flock reductions indicated, as egg exports decreased and the egg-per-hen rate increased. Adjusting for these factors, the effective reduction in supply in 2022 was about 3.5 million hens, or 1 percent of the national flock, as shown below.



162.    According to the same graph, at no point during the Class Period did the supply of egg-laying hens and Conventional Eggs fall below 2015 levels.

163.    Analysts and consumer advocates have noted that bird flu losses in recent years have been insufficient to explain the magnitude of the price spikes during the Class Period.

39

Hunterbrook's analysis of USDA data found that the effective reduction in the national hen flock was only about 1% compared to 2021, yet average wholesale prices rose 127% in 2022. Average wholesale prices rose 54.6% in 2023—a 17% increase in price per 1% decrease in supply—and 127.7% in 2024—a 25% increase in price per 1% decrease in supply.

164.    Indeed, from 2022 through 2024, price increases per unit of supply loss were three to four times greater than during the 2015 avian flu outbreak—a disparity that cannot be explained by legitimate cost or demand changes. In 2015, egg prices rose only 7.16% for each 1% decline in flock size, and prices normalized within a year as supply recovered. By contrast, in 2022 prices jumped 33% per 1% flock reduction, followed by 17% in 2023 and 25% in 2024—multipliers inconsistent with normal market behavior.



165.    The data suggests that claims of an unprecedented shortage due to Class Period-HPAI were (and are) overstated. One advocacy group, analyzing USDA data, reported that losses in the total size of the U.S. egg-laying flock as a result of Class Period-bird flu were actually quite modest. In a month-to-month comparison to 2021, the egg-laying flock was, on average, only 3.82% smaller in each month of 2022, 3.16% smaller in each month of 2023, and 5.18% smaller in each month of 2024. These small declines cannot plausibly account for the extreme and

sustained price spikes observed during the Class Period.

166.    The spike in U.S. egg prices becomes even more perplexing when contrasted with Europe, which experienced a severe supply shortage in 2022 after the depopulation of 50 million layers—compared to 43 million in the U.S. Despite this, European egg prices increased by only about 30% from January 2022 to January 2023, whereas U.S. prices surged nearly 170% over the same period.

2.    There were no material constraints to rebuilding flocks and production capacity

167.    The industry's ability to rebuild flocks with over 35 million hens within 8 months following the 2015 HPAI outbreak demonstrates the absence of structural barriers to restoring supply.

168.    As to the avian flu during the Class Period however, the egg-laying flock has not yet recovered to its pre-outbreak size of roughly 330 million hens. Between 2023 and 2024, flock size fluctuated between 310 and 320 million before falling to 300 to 320 million in 2024.

169.    In reality, as explained earlier in this complaint, the Egg Producer Defendants could have restored supply of Commodity Shell Eggs more quickly than they actually did—and that their slow pace in doing so indicates a deliberate decision, one inconsistent with recent prior industry behavior and which cannot be explained by physical or logistical constraints

3.    Input costs do not explain Shell Egg price increases

170.    Chicken feed is a significant marginal cost of commodity shell egg production. Feed, primarily corn and soybean meal, is therefore also a primary cost component in shell egg production, which accounts for more than half of production costs. Other sources have indicated feed costs could represent as much as 60 to 70 percent of egg farm production costs.

171.    According to one study, between 2021 and 2022, processing costs increased by

41

approximately 20 percent. Cal-Maine's 2022 financial statement reported that egg farm production and feed costs rose by 22 percent compared to 2021.

172.    Yet, according to the Urner Barry Midwest Price Report, between December 20, 2021, and December 19, 2022, the wholesale price for a dozen of large Grade A Conventional Shell Eggs jumped from approximately $1.76 to approximately $5.43—an increase of 208 percent.

173.    The significant divergence between feed input costs and the price of Commodity Shell Eggs is economically significant and indicates that prices were not being established by competitive market forces. Rather, the fissure between feed costs and the dramatic and sustained price increases, in the absence of similarly elevated and sustained input costs, is indicative of and consistent with coordinated efforts to raise and fix prices at supra-competitive levels.

174.    The same dynamic occurred in other input costs for egg production. As one executive at a pasture-raised eggs producer—a producer that does not sell Commodity Shell Eggs priced by Urner Barry—explained: "I don't see anything in my cost structure that would have led me to raise our prices by as much as you're reporting. . . . I can't explain why prices have gone as high as they have."

175.    As shown below, energy costs appear wholly detached from commodity shell egg prices during the Class Period, as prices rose dramatically in the face of declining energy costs.

42



176. According to public sources and industry disclosures, other input costs, such as grower compensation and pay, have also remained flat or experienced modest increase during the Class Period. Indeed, over a six-year period overlapping the Class Period, industry giant Cal-Maine's per-egg supply costs appear to have barely increased at all. Documentation obtained by Farm Action from a farming family with a long-standing Cal-Maine supply contract reveals that contract farmers received only a $0.0125 per dozen increase over a six-year period—a total payment of $0.2675 per dozen—even as Cal-Maine's benchmark-driven wholesale prices increased threefold.

177. Increases in production costs simply do not explain the steep price increases exhibited during the Class Period for Commodity Shell Eggs. Under competition, one would expect price paths to track costs and supply shocks. That has not been the case for Commodity Shell Eggs in the United States during the Class Period. Instead, prices and costs have diverged, to the profit of commodity shell egg producers, and in particular, the Egg Producer Defendants

    4. <u>Defendants' Financial Records Confirm Price Increases Were Not Cost-Driven</u>

178. Compelling evidence that cost increases cannot explain Class Period egg prices also

comes from Defendant Cal-Maine's own financial statements. In a competitive commodity market, producers facing higher input costs can, at most, pass those increases through to customers on a roughly one-to-one basis. Revenues may rise, but profit margins remain flat—or more commonly, shrink—because competitive pressure prevents firms from fully passing on cost increases without losing customers to lower-priced rivals. Margin expansion—profits growing dramatically faster than costs—is the opposite of what competitive markets produce. It is an unmistakable economic signature of supracompetitive pricing power.

179.    Cal-Maine's financial results during the Class Period reflect exactly that pattern. Reports show that while Cal-Maine's sales volume remained stable, its profit margins exploded, with multiple quarters of gross profit exceeding the company's prior full-year totals. Before the avian flu outbreak, Cal-Maine reported gross profits of $179.6 million in FY20 (June 2019–June 2020) and $160.7 million in FY21 (June 2020–June 2021), while annual egg production held steady at approximately 1.1 billion dozen eggs.

180.    After the 2022 avian flu outbreak, however, Cal-Maine's profits skyrocketed. The company reported $1.2 billion in gross profit in FY23 (June 2022–June 2023) and $541.6 million in FY24 (June 2023–June 2024), again with sales volume essentially unchanged at roughly 1.1 billion dozen eggs per year. The trend continued into FY25, with Q1 and Q2 gross profits of $247.2 million and $356.0 million, respectively. On average, Cal-Maine's annual profits increased 747% in the first full year of the class period (FY23), stayed elevated for another two years, then collapsed upon the announcement of a DOJ price fixing investigation. These results are not reflective of a competitive market responding to higher costs.

181.    Since the announcement of a price-fixing investigation by the DOJ in March 2025, Cal-Maine's revenues and profits have cratered. According to Cal-Maine's February 28, 2026 10-

Q, the company's year-over-year net sales decreased *53%* between the quarter ending March 1, 2025 ($1.418 billion), and the quarter ending February 28, 2026 ($667 million). The company's net income—its profits—decreased a staggering *90%* over the same time frame ($508 million in the quarter ending March 1, 2025; $50 million in the quarter ending February 28, 2026). Taking into account the thirty-nine weeks preceding these two dates, Cal-Maine's net sales decreased year-over-year by more than 25% ($3.158 to $2.359 billion), and its net income by 60% ($876 to $353 million).

182. Cal-Maine itself attributed its extraordinary profits over the Class Period to higher selling prices, and its post-Class Period revenues and profits cratered alongside market prices upon disclosure of the DOJ price-fixing investigation. Although the other Egg Producer Defendants are privately held, the unprecedented pricing conditions during the Class Period—conditions wholly disconnected from production costs or genuine supply constraints—support the reasonable inference that they too reaped profits far above historical norms.

5. The sharp decrease in prices following the DOJ's announcement of its investigation indicates that the price of shell eggs was not driven by market forces

183. On March 6, 2025, various news outlets, including The Capitol Forum and The Wall Street Journal, reported that DOJ was investigating whether egg producers—including Defendants Cal-Maine and Rose Acre—had conspired to raise prices of eggs. According to the reporting, DOJ sent letters to egg producers asking them "to preserve documents about their pricing conversations with customers and competitors, as well as communications with Urner Barry.

184. In a 10-Q SEC filing published April 8, 2025, Defendant Cal-Maine confirmed it was under investigation by DOJ. In that filing, it stated that it received a civil investigative demand from DOJ in March 2025.

45

185. After the investigation became public, egg prices dropped precipitously. For instance, on March 5, the average wholesale cost of a dozen large grade A white eggs was $8.12. On March 19, about two weeks after DOJ's investigation became public, those same eggs cost $3.03—a 62.7 percent decrease. Egg prices at retail also dropped around this time.

186. This did not go unnoticed. On May 8, 2025, in a letter supporting the DOJ's investigation, Senators Elizabeth Warren and Jim Banks expressed "concern[] that record high egg prices reflect noncompetitive behavior among large producers."

187. The speed and magnitude of the price drop strongly suggest that prior egg prices were sustained through coordinated conduct, rather than competitive market forces.

188. On April 17, 2026, the Wall Street Journal reported that the DOJ was preparing to file an antitrust lawsuit against some of the largest U.S. egg producers, including Cal-Maine and Versova.

189. On June 29, 2026, the DOJ and several states indeed filed such a lawsuit, as described in more detail below.

**C.      Plus Factors Corroborate Defendants' Conspiracy**

190. Plus factors are economic actions and outcomes, above and beyond parallel conduct among oligopolists, that are largely inconsistent with unilateral conduct but consistent with coordinated action, and that support an inference of conspiracy. Detecting a cartel is much like diagnosing a disease: no single symptom is dispositive, but taken together, the plus factors described below make the diagnosis of an unlawful conspiracy far more reliable than parallel conduct alone.

191. The plus factors that corroborate the conspiracy alleged in this Complaint include: (1) a government investigation and enforcement action targeting the same benchmark-manipulation scheme; (2) Defendants' history as recidivist antitrust violators; (3) Defendants'

46

actions against their unilateral economic self-interest; (4) Defendants' common motive; (5) Defendants' numerous opportunities to collude; (6) high barriers to entry; (7) inelastic demand for Commodity Shell Eggs; and (8) the fungible, interchangeable nature of Commodity Shell Eggs.

1.    A Government Investigation and Enforcement Action Targeting the Conduct Alleged in this Complaint

192.    On June 29, 2026, the U.S. Department of Justice and seventeen state attorneys general filed a civil antitrust enforcement action in the U.S. District Court for the Northern District of Iowa against Cal-Maine, Versova, and Hickman's Egg Ranch, Inc., alleging that those companies violated Section 1 of the Sherman Act by conspiring to submit coordinated bids designed to artificially inflate Urner Barry's daily egg price quotations between 2022 and 2025— the same benchmark, the same mechanism, and substantially the same period at issue in this Complaint. *United States, et al. v. Cal-Maine Foods, Inc., et al.*, No. 5:26-cv-04060 (N.D. Iowa, filed June 29, 2026). That action followed a lengthy federal investigation, publicly reported to have begun in March 2025.

193.    While the government's civil action names only a subset of the entities alleged to have participated in the conspiracy described in this Complaint, its detailed factual findings— summarized above—corroborate that the mechanism by which Defendants are alleged to have manipulated the Urner Barry benchmark is not a theoretical vulnerability, but one that has already been investigated and pursued by federal and state enforcers. The existence of a parallel government enforcement action targeting the same benchmark, the same conduct, and overlapping Defendants is itself a powerful corroboration of the conspiracy alleged here.

2.    Defendants Acted Against Their Unilateral Economic Self-Interest

194.    No individual Egg Producer Defendant, acting alone, could meaningfully move the Urner Barry benchmark through unilateral bidding or reporting. As described above, Urner Barry's

47

quotations are built from aggregated market data, and a producer who unilaterally reported prices detached from prevailing conditions would risk both damaging its credibility with Urner Barry's reporters and losing access to a pricing tool on which the producer's own contracts depend. Unilateral manipulation is accordingly self-defeating; coordinated manipulation, in which multiple producers reinforce one another's bids and reports, is not.

195.    Likewise, in a competitive market, a producer that sees prices and margins surge has every incentive to expand output as quickly as possible to capture the elevated prices before competitors respond—a dynamic that, in previous avian-influenza episodes, produced swift production recoveries. As described above, however, Defendants collectively slowed the restoration of their flocks during the Class Period despite favorable conditions and declining costs. That restraint yields sustained supracompetitive prices only if all major producers refrain from expanding output at the same time—an outcome that requires mutual assurance that no competitor will break ranks to capture market share, and that is difficult to explain as the product of independent, unilateral decision-making.

### 3.    Some of the Egg Producer Defendants are recidivist conspirators

196.    The egg industry, including several of the Defendants named here, have previously been targeted by private litigants for anticompetitive and unfair business practices.

197.    In 2008, direct purchasers of processed egg product sued Egg Producer Defendants Cal-Maine, Daybreak, Hillandale, and Rose Acre alleging that these producers, along with other trade groups and egg producers, conspired to limit the supply of eggs in order to raise prices by enforcing supply restrictions by jointly developing and implementing an egg certification program, exporting eggs, and declining production by reducing hatch, early molting, and hen disposal. *See In re Processed Egg Prod. Antitrust Litig.*, 962 F.3d 719 (3d Cir. 2020).

198.    All defendants but one settled with the direct purchasers for a total recovery of

48

approximately $136 million. *See In re Processed Egg Products Antitrust Litigation*, No. 08-md-2002 (E.D. Pa.).

199.    In 2011, Kraft Foods Global, Inc., the Kellogg Company, General Mills, Inc., and Nestlé USA, Inc. sued Cal-Maine, Rose Acre, and trade group United Egg Producers, among others, in the Northern District of Illinois on antitrust allegations similar to those brought in the E.D. Pa. MDL, but including allegations about the unusually cozy nature of the egg industry. *See Kraft Foods Global, Inc. et al. v. United Egg Producers, Inc. et al.*, No. 1:11-cv-08808 (N.D. Ill.). After a seven-week jury trial, a jury found that Cal-Maine and Rose Acre conspired with each other and returned a $17.8 million dollar verdict (before trebling) on Kraft's and Kellogg's price fixing claim. On November 6, 2024, the court rendered Final Judgment against Cal-Maine, Rose Acre, United Egg Producers, and United States Egg Marketers, Inc. in the amount of $53.3 million, plus reasonable attorney's fees. *Kraft Foods Global, Inc. et al. v. United Egg Producers, Inc. et al.*, No. 1:11-cv-08808 (N.D. Ill.), Dkt. 720 (Nov. 6, 2024).

### 4.    Defendants Have a Common Motive

200.    Further, the Egg Producer Defendants had a common motive to manipulate Urner Barry benchmark prices during the Class Period—inflating that single benchmark would have the effect of inflating actually-paid wholesale and retail egg prices nationwide, thereby greatly increasing the Producer Defendants' revenues and profits given the highly inelastic nature of commodity shell egg demand in the United States. And indeed, this is exactly what happened, with not just egg prices but egg producer profits—as seen in SEC filings by Cal-Maine, the only publicly-traded Producer Defendant—doubling, tripling, and even quadrupling over the Class Period (and immediately collapsing upon revelation of a DOJ price-fixing inquiry).

5.     Conventional and Cage-Free Shell Eggs Are Fungible, Interchangeable Commodities

201.   Conventional and cage-free shell eggs are fungible commodities with minimal product differentiation, a market characteristic that greatly simplifies the formation and maintenance of a price-fixing conspiracy. When products are homogenous, firms compete primarily on price. This creates a powerful incentive to collude, as price competition in a commodity market can be destructive to profits. By agreeing to fix prices or restrict output, competitors can avoid price wars and collectively exercise market power.

202.   Government grading standards make Commodity Shell Eggs functionally identical within regions, eliminating non-price competition and simplifying the detection of price deviations.

6.     Commodity Shell Eggs Have Inelastic Demand

203.   Commodity Shell Eggs also exhibit relatively inelastic demand—*i.e.*, consumers purchase similar quantities regardless of price fluctuations. Indeed, demand for eggs remained steady throughout the higher prices during the Class Period. A market with inelastic demand is more susceptible to collusion and price-fixing because competitors can raise prices without suffering a significant decrease in sales or profit.

204.   The inelasticity of demand for eggs is widely acknowledged within the industry. UEP president Gene Gregory told Egg Industry magazine in February 2007 that "[w]hether eggs are 39 cents or $1.25 per dozen, customer purchases are the same." Agricultural economist Jada Thompson has similarly explained that egg buyers, including processors who use eggs as an input in other food products, have no substitute for what they need: "We demand eggs . . . in order to make the bread, they need eggs. In order to buy those eggs, there's a low supply, so they're going to keep bidding until they get those eggs." As Dr. Thompson observed, this dynamic means that

50

"Cal-Maine or any other company that is able to sell eggs during periods of high price [is] going to basically win out" by capturing additional profit from the only available supply.

205. As one Cal-Maine investor presentation noted, "The price of eggs in relation to the overall amount we spend on groceries does not matter."

206. Because of this price inelasticity, the structure of the egg production market makes the egg industry particularly susceptible to price manipulation. Defendants can elevate prices to artificially high levels with little concern that higher prices will materially reduce sales volume or diminish profits.

### 7. Defendants Have Numerous Opportunities to Collude

207. Egg Producer Defendants are involved in multiple industry trade associations and regularly attend trade meetings, giving them ample time and opportunity to coordinate supply restraints and curtail cheating on the conspiracy. The Egg Producer Defendants are members of UEP and the American Egg Board ("AEB"), national trade associations representing large U.S. egg producers. These associations host meetings, conferences, and committee gatherings that bring together high-level executives from competing firms, providing a forum for illegal discussions and coordination.

208. For example, since 2021, the AEB and UEP have hosted an annual joint conference attended by Producer Defendants.

209. Moreover, employees of the Egg Producer Defendants have been on the board of UEP. Rose Acre's participation in UEP is revealing. For over thirty years, Rose Acre declined to join UEP. Then, in 2002, Rose Acre not only joined but immediately placed its CEO, David Rust, on the UEP Board—at the precise moment when the supply-restriction conduct that the jury later found unlawful in *Kraft Foods Global, Inc. v. United Egg Producers, Inc.* was taking hold. Rust explained that he wanted to serve on the board of directors so that he could get "a vote at the table."

51

Rose Acre's sudden commitment to UEP governance coincided with its adoption of the UEP Certified supply-restriction program. In October 2023, Sherman Miller (CEO of Cal-Maine Foods) was elected Treasurer of the Board of UEP for 2024, and Marcus Rust (CEO of Rose Acre Farms) was elected as a representative at-large. The presence of senior executives from multiple Defendants in UEP's top leadership provides a continuing forum for regular communication and alignment among competitors.

210.    Trade associations also create and disseminate "guidelines," "certification programs," and industry data that can be used as vehicles to orchestrate and monitor a collusive scheme. In fact, "at trial, the most important part" of the adjudicated conspiracy in the *Kraft Foods* case was the "UEP Certified Program," which aided producers such as Cal-Maine and Rose Acre in restricting the supply of eggs. UEP Certified is still in force today.

211.    Additionally, Urner Barry hosts an annual Executive Conference which employees of Defendants have attended during the Class Period. Urner Barry markets this event as "a must-attend event for decision-makers in the protein industry . . . Where the protein industry's most influential members go to network, learn and advance their professional development." Employees of Defendants have even been seen together at these conferences. Urner Barry and Rose Acre employees were photographed together at the 2011 conference. In 2021, Bill Rehm, CEO of Daybreak, was a scheduled guest speaker at the conference. Finally, Defendants, including Cal-Maine, have sponsored this event in the past. Trade association membership and industry events provide Defendants opportunities to collude.

212.    In addition to UEP and the Urner Barry Executive Conference, the World Egg Organization ("WEO") hosts an annual Global Leadership Conference that brings together the senior leadership of the world's largest egg producers. Marcus Rust, CEO of Defendant Rose Acre,

was named WEO's International Egg Person of the Year at the most recent conference. These international forums provide Defendants with additional opportunities to communicate outside of domestic channels and to align on production and pricing strategy.

8.      High Barriers to Entry Protect the Conspiracy from Competitive Discipline

213.   Egg producers face significant entry barriers including financial, regulatory, operational, and logistical costs. Potential new entrants face a variety of capital costs, including land acquisition, construction of specialized poultry houses, and purchases of feeding, watering, climate control, and waste management equipment. One industry source estimated that between permitting (one year or more), construction (approximately six months after building contracts have been issued), and stocking (roughly four months to raise a pullet flock), it can take up to two years before production of shell eggs can be expected from new housing. Potential new entrants would also need to displace longstanding customer relationships. Further, because of the vertically-integrated nature of the largest egg producers, including with respect to breeding, packaging, processing, transportation, and sale to the largest retailers, reliance on or economic interdependence with one or more of the Egg Producer Defendants is a de facto requirement for a new or smaller producer of Commodity Shell Eggs. As a result, new entrants into the market are unlikely to discipline cartel pricing.

214.   These figures are not hypothetical. A 2013 USDA report estimated that a typical Midwest multi-age, inline egg production facility housing 1.5 to 4.0 million laying hens requires a capital investment ranging from approximately $24 million (for a 1-million-hen operation) to $80 million (for a 4-million-bird complex). Consistent with those figures, Rose Acre broke ground in May 2023 on a new Arizona facility projected to cost $100 million, and Cal-Maine spent an estimated $54 to $67 million in 2023 to acquire Fassio Egg Farms and $110 million in 2024 to acquire the operations of ISE America. When a market is protected by barriers to entry and exit of

53

this magnitude, conspirators can fix supracompetitive prices with little concern that new entrants will bid the price back down.

## CLASS ACTION ALLEGATIONS

215. Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a), (b)(1) and (b)(2) of the Federal Rules of Civil Procedure on behalf of the members of a class of commercial indirect purchasers seeking injunctive relief (the "Nationwide Injunctive Relief Commercial Indirect Class") defined as follows:

> All persons and entities in the United States and Puerto Rico who purchased Commodity Shell Eggs other than directly from the Egg Producing Defendants or their co-conspirators for their own business use in commercial food preparation from January 1, 2022, until such time that the adverse effects of Defendants' anticompetitive conduct cease.

216. Plaintiffs also bring this action on behalf of themselves, and all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages as well as equitable relief, on behalf of the following class (the "Commercial State Law Damages Class"):

> All persons and entities who purchased Commodity Shell Eggs other than directly from the Egg Producing Defendants or their co-conspirators for their own business use in commercial food preparation in Arizona, Arkansas, California, Colorado, Connecticut, Delaware, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, South Carolina, Tennessee, Utah, Vermont, West Virginia, and Wisconsin, and Puerto Rico from January 1, 2022 until such time that the adverse effects of Defendants' anticompetitive conduct cease.

217. Specifically excluded from the Nationwide Injunctive Relief Commercial Indirect Class and the Commercial State Law Damages Class (collectively "Commercial Indirect Purchaser

Classes" or "Classes") are Defendants the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant; and any government entity. Also excluded from these Classes is any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, any business majority-owned by any such person, and any Co-conspirator identified in this action.

218. Plaintiffs reserve the right to modify these definitions or to propose subclasses, as appropriate, based on further investigation and discovery.

219. **Numerosity**: The members of the Commercial Indirect Purchaser Classes are so numerous that joinder of all members would be impracticable. The exact number of class members in the Commercial Indirect Purchaser Classes is unknown to Plaintiffs at this time, but it is estimated to be in the hundreds of thousands. The members of the Commercial Indirect Purchaser Classes should be readily identifiable from existing records.

220. **Typicality**: Plaintiffs' claims are typical of the claims of the Classes because Plaintiffs purchased Commodity Shell Eggs indirectly from one or more of the Defendants for their own business use in commercial food preparation, and therefore Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the members of the Classes and the relief sought is common to the Classes. Plaintiffs allege injuries that are not unique to them but are typical of members of each of the Classes, including measures of damages and/or nominal damages.

221. **Common Questions Predominate**: There are questions of law and fact common to the Classes, including, but not limited to:

a.  Whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, or stabilize the price of Commodity Shell Eggs in the United States;

b.  Whether such combination or conspiracy constituted violations of the Sherman Antitrust Act;

c.  Whether such combination or conspiracy violated the antitrust, unfair competition, and consumer protection laws of various states;

d.  Whether the conduct of Defendants and their co-conspirators, as alleged herein, caused injury to Plaintiffs and other members of the Commercial Indirect Purchaser Classes;

e.  Whether Defendants caused Plaintiffs and the members of the Commercial Indirect Purchaser Classes to suffer damages in the form of overcharges on Commodity Shell Eggs indirectly purchased from the Defendants or their producing co-conspirators;

f.  The effect of Defendants' conspiracy on Commodity Shell Eggs sold in the United States during the Class Period;

g.  The identity of the participants of the alleged conspiracy;

h.  The duration of the conspiracy alleged herein, and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

i.  Whether Defendants fraudulently concealed their misconduct;

j.  Whether Defendants' anticompetitive scheme inflated prices of Commodity Shell Eggs above competitive levels;

k.  The appropriate measure of classwide damages for the Commercial Indirect Purchaser Classes; and

l.  The nature and scope of injunctive relief necessary to restore competition in the Commodity Shell Eggs market.

These and other questions of law or fact which are common to the members of the Classes predominate over any questions affecting only individual members of the Classes.

222.  **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the Classes in that Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of

56

the Classes who indirectly purchased Commodity Shell Eggs for their own business use in commercial food preparation during the Class Period and Plaintiffs have retained competent counsel experienced in the prosecution of class actions and antitrust litigation to represent them and the Classes.

223.    **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged Class Members is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. A class action will permit numerous similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of evidence, effort, or expense. A class action will provide injured persons with a method for obtaining redress on claims that could not practicably be pursued individually. Moreover, the prosecution of separate actions by individual members of the Commercial Indirect Purchaser Classes would create a risk of inconsistent or varying adjudications, potentially establishing incompatible standards of conduct for Defendants. Plaintiffs know of no manageability or other issues that would preclude maintenance of this case as a class action.

224.    **Common Grounds for Injunctive Relief:** Defendants have taken actions that generally impact the Classes in a consistent manner so that final injunctive relief is appropriate for the Classes collectively under Fed. R. Civ. P. 23(b)(2).

### DEFENDANTS ARE ENGAGED IN CONTINUING ANTITRUST VIOLATIONS

225.    During the Class Period, Defendants continued to sell Commodity Shell Eggs to Plaintiffs and other putative Class Members at prices artificially inflated by Defendants' conspiracy. The artificial increases to the pricing of Commodity Shell Eggs set forth in this complaint had long lasting and continuing effects which resulted in Class Members continuing to

57

pay artificially inflated prices for Commodity Shell Eggs continuing through the present. Furthermore, Class Members purchased Commodity Shell Eggs frequently and consistently throughout the Class Period.

226.    Due to ever-fluctuating economic and market conditions, Defendants needed to continually renew, monitor, and adjust their conspiratorial agreement. This resulted in multiple coordinated effective price increases throughout the Class Period, as described here. Moreover, each of these activities resulted in new, overt acts that injured Plaintiffs and the putative Classes, thus creating a new cause of action for purposes of the statute of limitations.

227.    In addition, each sale of Commodity Shell Eggs made to Plaintiffs or the putative Classes that was artificially inflated as a result of the conspiracy also constituted a new, overt act that restarted the statute of limitations.

228.    These new, overt acts—which would not have occurred had the conspiracy disbanded—were not merely reaffirmations of Defendants' previous acts. Rather, they were new and independent acts that were necessary to renew and refine Defendants' agreement, resulting in new and accumulating injury to Plaintiffs and the other members of the proposed Classes.

229.    As a result, Defendants engaged in a continuing antitrust violation throughout the Class Period and, regardless of any tolling- or estoppel-related arguments, Plaintiffs' claims and those of the putative Classes are not time barred.

**TOLLING OF STATUTE OF LIMITATIONS**

230.    Plaintiffs and members of the proposed Classes had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and Class Members did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this action. Indeed, key evidence of the

58

conspiracy and its members was only made public in late June 2026, when the Department of Justice and several state attorneys general filed suit against certain egg producers for antitrust violations in *United States, et al. v. Cal-Maine Foods, Inc., et al.*, No. 5:26-cv-04060 (N.D. Iowa June 29, 2026), or provided to Plaintiffs through discovery in this litigation. And Plaintiffs and the Class Members had no knowledge at all of the unlawful conduct alleged in this Complaint, or any of the facts that could or would have led to the discovery thereof, until March 2025, when it was publicly revealed that the Department of Justice was investigating U.S. egg prices.

231.    Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from Plaintiffs and members of the proposed Classes, including by coordinating in secret through text messages, phone calls, and emails between high-level executives of conspirators, *see United States, et al. v. Cal-Maine Foods, Inc., et al.*, No. 5:26-cv-04060 (N.D. Iowa June 29, 2026), Dkt. 1, and by maintaining as confidential their trading and other activities meant to influence Urner Barry egg price benchmarks.

232.    Due to Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiffs and/or members of the proposed Classes has been equitably tolled during the period of such fraudulent concealment, at least until March 2025 if not shortly prior to the filing of this consolidated complaint.

### ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT

233.    Defendants' anticompetitive conduct had the following effects, among others:

A.    Price competition was restrained or eliminated with respect to Commodity Shell Eggs;

B.    The prices of Commodity Shell Eggs were fixed, raised, stabilized, or

maintained at artificially inflated levels;

C.    Commercial Indirect purchasers of Commodity Shell Eggs were deprived of free and open competition; and

D.    Commercial Indirect purchasers of Commodity Shell Eggs paid artificially inflated prices.

234.    The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, or maintain the price of Commodity Shell Eggs. As a direct and foreseeable result, Plaintiffs and the members of the Classes paid supracompetitive prices for Commodity Shell Eggs during the Class Period.

235.    The price effects of Defendants' conduct impacted the Commercial Indirect Purchaser Class Members in this case who paid supracompetitive prices for Commodity Shell Eggs they were unable to purchase or acquire elsewhere because 95% of all Commodity Shell Eggs are subject to Urner Barry quotations that Defendants successfully manipulated and artificially inflated.

236.    Egg prices have risen sharply since early 2022. Wholesale prices for Grade-A, Large, White Shell Eggs, which generally ranged from about $0.50 to $1.30 per dozen in 2021, climbed to roughly $1.50 to $5.00 per dozen in 2022. Although prices eased somewhat in 2023, that decline was temporary. By August 2024, prices began increasing again, reaching approximately $3.00 to $6.00 per dozen by the end of the year. By January 2025, the national weekly price index for Grade-A, Large eggs had climbed even higher, reaching about $6.00 to $8.00 per dozen.[6]

---

[6]https://farmaction.us/wp-ontent/uploads/2025/02/Final_FarmAction_FTC_DOJ_EggPricesLetter.pdf.

237. Generally accepted economic principles dictate that an overcharge at the top of a multi-level distribution chain will result in higher prices at every level of distribution below. Therefore, at least some portion of an anticompetitive overcharge will be passed on by intermediaries, such as distributors, to commercial indirect purchasers.

238. Here, while direct purchasers of Commodity Shell Eggs were the first to pay supra-competitive prices, some or all of the overcharges were passed along the distribution chain and absorbed by downstream purchasers, including Plaintiffs and Commercial Indirect Purchaser Class Members, when they purchased Commodity Shell Eggs from distributors and wholesalers for business use in commercial food preparation.

239. By reason of the alleged violations of the antitrust laws, Plaintiffs and the Commercial Indirect Purchaser Class Members sustained injury to their property, having paid higher prices for Commodity Shell Eggs than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy.

240. These overcharges are exactly the type of antitrust injuries the state antitrust and consumer protection laws were intended to punish and prevent.

241. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the overcharge passed through the various levels of distribution. As a result, the economic harm to Plaintiffs and Class Members can be readily quantified.

## CLAIMS FOR RELIEF

### COUNT 1
### RESTRAINT OF TRADE IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1
### (On Behalf of Plaintiffs and the Nationwide Class for Injunctive Relief)

242. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

243. Egg Producing Defendants are direct competitors in the Commodity Shell Eggs

61

market throughout the United States.

244.    Beginning as early as January 1, 2022, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, and until such time that the adverse effects of Defendants' anticompetitive conduct cease, Defendants and their co-conspirators entered into a continuing agreement to unlawfully and unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by artificially reducing or eliminating competition for the pricing of Commodity Shell Eggs. The agreement was intended to and did unreasonably restrain trade and suppress competition with the purpose and effect of artificially raising, fixing, maintaining, or stabilizing prices of Commodity Shell Eggs in the United States. Pursuant to the agreement, Defendants agreed to—and did—manipulate the egg industry pricing indices in a manner that distorted and suppressed competition, knowing and intending that the information would be used to raise, fix, maintain, or stabilize prices of Commodity Shell Eggs sold to Plaintiffs and Commercial Indirect Purchaser Class Members.

245.    Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

246.    Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for Commodity Shell Eggs throughout the United States to be higher than they otherwise would have been in a competitive market.

247.    Defendants' conspiratorial acts caused unreasonable restraints in the market for Commodity Shell Eggs.

248.    As a result of Defendants' unlawful conduct, Plaintiffs and the members of the Nationwide Class were harmed by being forced to pay inflated, supra-competitive prices for

62

Commodity Shell Eggs.

249. In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and all their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint. Defendants' conspiracy had the following effects, among others:

A. Price competition for Commodity Shell Eggs was restrained, suppressed, and/or eliminated in the United States;

B. Prices for Commodity Shell Eggs sold by Defendants, their divisions, subsidiaries, and affiliates, and all their co-conspirators were fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

C. Plaintiffs and members of the Nationwide Class were deprived of the benefits of free and open competition in the purchase of Commodity Shell Eggs.

250. Defendants took all the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of Commodity Shell Eggs to be higher than it would be, but for Defendants' conduct.

251. As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and members of the Nationwide Class were injured in their business or property and will continue to be injured in their business and property by paying more for Commodity Shell Eggs than they would have paid and will pay in the absence of the conspiracy.

252. The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

## COUNT II
### VIOLATIONS OF STATE ANTITRUST STATUTES
**(On behalf of Plaintiffs and the Commercial State Law Damages Class)**

253. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

254. During the Class Period, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to fix, raise, maintain, and stabilize the price of Commodity Shell Eggs prices in various states to unreasonably restrain trade and commerce and harm commercial indirect purchasers in violation of the various state antitrust and other statutes set forth below.

255. In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the alleged combination and conspiracy, including agreeing to fix, raise, maintain, and stabilize the price of Commodity Shell Eggs which injured Plaintiffs and members of the Damages Class.

256. As a result, Plaintiffs and members of the Damages Class were deprived of free and open competition and paid more for Commodity Shell Eggs than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is the type of harm the antitrust laws of the states included herein were designed to prevent, and this injury flows from that which makes Defendants' conduct unlawful.

257. Accordingly, Plaintiffs and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

258. Defendants' anticompetitive acts described above were knowing, willful and constitute violations of the following state antitrust statutes:

259. **Arizona**: Defendants have entered into an unlawful agreement in restraint of trade

in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Defendants' conspiracy had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Arizona; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in Arizona. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq*.

260. **California**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Cal. Bus. & Prof. Code §§ 16700, *et seq*. Defendants' conspiracy alleged herein has had the following effects: (1) price competition for Commodity Shell Eggs has been restrained, suppressed, or eliminated in the State of California; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high, non-competitive levels throughout California; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in California. During the Class Period, Defendants' illegal conduct substantially affected California commerce. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Cal. Bus. & Prof. Code §§ 16720 *et seq*.

261. **Colorado**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Colo. Rev. Stat. §§ 6-4-104, *et seq.* Defendants' conspiracy had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and

eliminated throughout Colorado; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout Colorado; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in Colorado. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Colo. Rev. Stat. §§ 6-4-104, *et seq*.

262.    **Connecticut**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Conn. Gen. Stat. Ann. §§ 35-26, *et seq.* Defendants' conspiracy had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Connecticut; (2) Commodity Shell Egg prices were fixed, raised, and maintained at artificially high levels throughout Connecticut; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in Connecticut. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Conn. Gen. Stat. Ann. §§ 35-26, *et seq*.

263.    **Delaware**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Del. Code Ann. tit. 6, § 2101, *et seq*. Defendants' conspiracy had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Delaware; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout the Delaware; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-

66

competitive, artificially inflated prices for Commodity Shell Eggs in Delaware. During the Class Period, Defendants' illegal conduct substantially affected commerce in Delaware. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Del. Code Ann. tit. 6, § 2101, *et seq.*

264.    **District of Columbia**: Defendants have entered into an unlawful agreement in restraint of trade in violation of D.C. Code §§ 28-4501, *et seq*. Defendants' conspiracy had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout the District of Columbia; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under D.C. Code §§ 28-4501, *et seq*.

265.    **Hawaii:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Haw. Rev. Stat. §§ 480-1, *et seq*. Defendants' conspiracy had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Hawaii; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout Hawaii; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in Hawaii. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Haw. Code §§ 480-1, *et*

*seq.*

266.    **Illinois**: Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq.* Defendants' conspiracy had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Illinois; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout Illinois; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under 740 Illinois Compiled Statutes 10/1, *et seq.*

267.    **Iowa**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Defendants' conspiracy had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Iowa; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout Iowa; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

268.    **Kansas**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Kan. Stat. §§ 50-101, *et seq.* Defendants' conspiracy had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated

68

throughout Kansas; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in Kansas. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kan. Stat. §§ 50-101, *et seq*.

269.    **Maine**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10, §§ 1101 *et seq*. Defendants' conspiracy had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Maine; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout Maine; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in Maine. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Me. Rev. Stat. Ann. tit. 10, §§ 1104.

270.    **Maryland**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Md. Code, Com. Law § 11-201, *et seq*. Defendants' conspiracy had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Maryland; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout Maryland; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in Maryland. During the Class

69

Period, Defendants' illegal conduct substantially affected Maryland commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Md. Code, Com. Law § 11-201, *et seq*.

271.    **Michigan**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws §§ 445.771, *et seq*. Defendants' conspiracy had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Michigan; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mich. Comp. Laws §§ 445.771, *et seq*.

272.    **Minnesota**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. §§ 325D.49, *et seq*. Defendants' conspiracy had the following effects: (1) Price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Minnesota; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minn. Stat. §§ 325D.49, *et seq*.

273.    **Mississippi**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Miss. Code §§ 75-21-1, *et seq*. Defendants' conspiracy had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Mississippi; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Miss. Code §§ 75-21-1, *et seq*.

274.    **Nebraska**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Neb. Rev. Stat. §§ 59-801, *et seq*. Defendants' conspiracy had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Nebraska; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout Nebraska; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in Nebraska. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Neb. Rev. Stat. §§ 59-801, *et seq*.

275.    **Nevada**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Nev. Rev. Stat. Ann. §§ 598A.010, *et seq*. Defendants' conspiracy had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and

eliminated throughout Nevada; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout Nevada; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in Nevada. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nev. Rev. Stat. Ann. §§ 598A.010, *et seq*.

276.    **New Hampshire**: Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes Ann. § 356:1. Defendants' conspiracy had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout New Hampshire; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout New Hampshire; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in New Hampshire. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, *et seq*.

277.    **New Jersey**: Defendants have entered into an unlawful agreement in restraint of trade in violation of New Jersey Statutes Annotated § 56:9-1, *et seq*. Defendants' conspiracy had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout New Jersey; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout New Jersey; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the

Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in New Jersey. During the Class Period, Defendants' illegal conduct substantially affected New Jersey commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under N.J. Stat. Ann. § 56:9-1, *et seq*.

278.   **New Mexico**: Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated §§ 57-1-1, *et seq*. Defendants' conspiracy had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout New Mexico; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout New Mexico; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Statutes Annotated §§ 57-1-1, *et seq*.

279.   **New York**: Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Laws §§ 340, *et seq*. Defendants' conspiracy had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout New York; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in New York. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available

under New York General Business Laws §§ 340, *et seq*.

280.    **North Carolina**: Defendants have entered into an unlawful agreement in restraint of trade in violation of North Carolina General Statutes §§ 75-1, *et seq*. Defendants' conspiracy had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout North Carolina; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Egg in North Carolina. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina General Statutes §§ 75-1, *et seq*.

281.    **North Dakota**: Defendants have entered into an unlawful agreement in restraint of trade in violation of N.D. Cent. Code §§ 51-08.1-01, *et seq*. Defendants' conspiracy had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout North Dakota; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout North Dakota; (3) members of the Damages Class were deprived of free and open competition in North Dakota; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under N.D. Cent. Code §§ 51-08.1-01, *et seq*.

282.    **Oregon**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Or. Rev. Stat. §§ 646.725, *et seq*. Defendants' conspiracy had the following effects:

74

(1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Oregon; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in Oregon. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Or. Rev. Stat. §§ 646.780, *et seq*.

283. **Puerto Rico**: Defendants have entered into an unlawful agreement in restraint of trade in violation of P.R. Laws Ann. tit. 10, ch. 13, §§ 258, *et seq*. Defendants' conspiracy had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Puerto Rico; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout Puerto Rico; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in Puerto Rico. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under P.R. Laws Ann. tit. 10, ch. 13, §§ 258, *et seq*.

284. **Rhode Island**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Rhode Island General Laws §§ 6-36-4, *et seq*. Defendants' conspiracy had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Rhode Island; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout Rhode Island; (3) members of the Damages Class

75

were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in Rhode Island. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws §§ 6-36-11, *et seq*.

285.    **South Dakota**: Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws §§ 37-1-3.1, *et seq*. Defendants' conspiracy had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout South Dakota; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout South Dakota; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in South Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws §§ 37-1-3.1, *et seq*.

286.    **Tennessee**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, *et seq*. Defendants' conspiracy had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Tennessee; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs Tennessee. During the Class Period, Defendants' illegal conduct had a substantial effect on

Tennessee commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tenn. Code Ann. §§ 47-25-101, *et seq*.

287.    **Utah**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated §§ 76-10-3101, *et seq*. Defendants' conspiracy had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Utah; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout Utah; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in Utah. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-3101, *et seq*.

288.    **Vermont**: Defendants have entered into an unlawful agreement in restraint of trade in violation of 9 Vermont Stat. Ann. §§ 2453, *et seq*. Defendants' conspiracy had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Vermont; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout Vermont; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in Vermont. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under 9 Vermont Stat. Ann. §§ 2465, *et seq*.

289.    **West Virginia**: Defendants have entered into an unlawful agreement in restraint of

trade in violation of West Virginia Code §§ 47-18-3, *et seq*. Defendants' conspiracy had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout West Virginia; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout West Virginia; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in West Virginia. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-9, *et seq*.

290.    **Wisconsin**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Wis. Stat. §§ 133.01, *et seq*. Defendants' conspiracy had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Wisconsin; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in Wisconsin. During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wis. Stat. §§ 133.01, *et seq*.

## COUNT III
### VIOLATIONS OF STATE CONSUMER PROTECTION STATUTES
### (On behalf of Plaintiffs and the Commercial State Law Damages Class)

291.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

292.    During the Class Period, Defendants engaged in unfair competition or unfair, or unconscionable acts or practices in violation of the state consumer protection and unfair

competition statutes listed below.

293. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class Members were injured and are threatened with further injury.

294. Defendants' anticompetitive acts, described herein, constitute violations of the following state consumer protection laws:

295. **Arkansas**: Defendants have engaged in unfair or unconscionable acts or practices in violation of Ark. Code Ann. §§ 4-88-101, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Arkansas; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout Arkansas; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in Arkansas. During the Class Period, Defendants' unlawful, unfair, and unconscionable conduct substantially impacted commerce in Arkansas. Accordingly, Plaintiffs and Class Members seek all forms of available relief under this statute.

296. **California**: Defendants have engaged in unfair competition or unfair or unlawful acts or practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq*. Defendants' unfair and unlawful conduct has had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout California; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout California; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in California. During the Class Period, Defendants' unlawful and unfair

79

conduct substantially impacted commerce in California. Accordingly, Plaintiffs and Class Members seek all forms of available relief under this statute.

297.    **Florida**: Defendants have engaged in unfair methods of competition, unconscionable acts or practices, or unfair acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Florida; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in Florida. During the Class Period, Defendants' unlawful and unconscionable conduct substantially impacted commerce in Florida. Accordingly, Plaintiffs and Class Members seek all forms of available relief under Fla. Stat. §§ 501.201, *et seq*.

298.    **Hawaii**. Defendants have engaged in unfair methods of competition or unfair acts or practices in violation in violation of Haw. Rev. Stat. § 480-2. Defendants' conduct has had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Hawaii; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout Hawaii; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs Hawaii. During the Class Period, Defendants' unfair and unconscionable conduct substantially impacted commerce in Hawaii. Accordingly, Plaintiffs and Class Members seek all forms of available relief under Haw. Rev. Stat. § 480-2.

299.     **Illinois**. Defendants have engaged in unfair methods of competition or unfair acts or practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. 505/2, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Illinois; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout Illinois; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in Illinois. During the Class Period, Defendants' unfair and unconscionable conduct substantially impacted commerce in Illinois. Accordingly, Plaintiffs and Class Members seek all forms of available relief under 815 Ill. Comp. Stat. Ann. 505/10a, *et seq*.

300.     **Minnesota**: Defendants have engaged in unfair methods of competition or unfair or unconscionable acts in violation of the Minnesota Consumer Protection Act, Minn. Stat. § 325F.69, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Minnesota; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in Minnesota. During the Class Period, Defendants' unfair and unconscionable conduct substantially impacted commerce in Minnesota. Accordingly, Plaintiffs and Class Members seek all forms of available relief under Neb. Rev. Stat. § 59-1601, *et seq*.

301.     **Nebraska**: Defendants have engaged in unfair methods of competition or unfair

81

acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1602, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Nebraska; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout Nebraska; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in Nebraska. During the Class Period, Defendants' unfair and unconscionable conduct substantially impacted commerce in Nebraska. Accordingly, Plaintiffs and Class Members seek all forms of available relief under Neb. Rev. Stat. § 59-1601, *et seq*.

302. **Nevada:** Defendants have engaged in unfair or unconscionable acts or practices in violation of the Nevada Deceptive Trade Practices Act. Nev. Stat. § 598.0923, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Nevada; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout Nevada; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in Nevada. During the Class Period, Defendants' unlawful, unfair, or unconscionable conduct substantially impacted commerce in Nevada. Accordingly, Plaintiffs and Class Members seek all forms of available relief under Nev. Stat. § 598.0923, *et seq*.

303. **New Mexico**: Defendants have engaged in unfair or unconscionable trade practices in violation of New Mexico Stat. §§ 57-12-3, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout New Mexico; (2) Commodity Shell Egg prices were raised, fixed, and

82

maintained at artificially high levels throughout New Mexico; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in New Mexico. During the Class Period, Defendants' unlawful, unfair, and unconscionable conduct substantially impacted commerce in New Mexico. Accordingly, Plaintiffs and Class Members seek all forms of available relief under N.M. Stat. §§ 57-12-1, *et seq.*

304. **North Carolina**: Defendants have engaged in unfair methods of competition or unfair acts or practices in violation of N.C. Gen. Stat. §§ 75-1.1, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout North Carolina; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in North Carolina. During the Class Period, Defendants' unlawful, unfair, or unconscionable conduct substantially impacted commerce in North Carolina. Accordingly, Plaintiffs and Class Members seek all forms of available relief under this statute. N.C. Gen. Stat. §§ 75-1.1, *et seq.*

305. **Rhode Island**: Defendants have engaged in unfair methods of competition or unfair acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act. R.I. Gen. Laws §§ 6-13.1-1, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Rhode Island; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout Rhode Island; (3) members of the Damages Class were deprived

of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in Rhode Island. During the Class Period, Defendants' unlawful, unfair, or unconscionable conduct substantially impacted commerce in Rhode Island. Accordingly, Plaintiffs and Class Members seek all forms of available relief under R.I. Gen. Laws §§ 6-13.1-1, *et seq*.

306. **South Carolina**: Defendants have engaged in unfair methods of competition or unfair acts or practices in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-20 *et seq*. Defendants' conduct has had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout South Carolina; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout South Carolina; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in South Carolina. During the Class Period, Defendants' unlawful, unfair, or unconscionable conduct substantially impacted commerce in South Carolina. Accordingly, Plaintiffs and Class Members seek all forms of available relief under S.C. Code Ann. §§ 39-5-10 *et seq*.

307. **Vermont**: Defendants have engaged in unfair methods of competition or unfair acts or practices in violation of 9 Vermont Stat. Ann. §§ 2451, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout Vermont; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout Vermont; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in Vermont. During the Class

84

Period, Defendants' unlawful, unfair, or unconscionable conduct substantially impacted commerce in Vermont. Accordingly, Plaintiffs and Class Members seek all forms of available relief under 9 Vermont Stat. Ann. §§ 2451, *et seq*.

308.    **West Virginia**: Defendants have engaged unfair methods of competition or unfair acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code §§ 46A-6-104, *et seq*. Defendants' conduct has had the following effects: (1) price competition for Commodity Shell Eggs was restrained, suppressed, and eliminated throughout West Virginia; (2) Commodity Shell Egg prices were raised, fixed, and maintained at artificially high levels throughout West Virginia; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Commodity Shell Eggs in West Virginia. During the Class Period, Defendants' unlawful, unfair, or unconscionable conduct substantially impacted commerce in West Virginia. Accordingly, Plaintiffs and Class Members seek all forms of available relief under W.Va. Code §§ 46A-6-101, *et seq*.

## COUNT IV
### UNJUST ENRICHMENT
**(On behalf of Plaintiffs and the Commercial State Law Damages Class)**

309.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

310.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.[7]

311.    As a result of their unlawful conduct described above, Defendants have and will

---

[7] Unjust enrichment claims are alleged under the laws of the following states and territories: Arkansas, Arizona, California, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices, and unlawful profits on sales of eggs.

312.    Defendants have benefitted from their unlawful acts, and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the Class Members for eggs.

313.    Plaintiffs and the Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the Class Members are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Class may make claims on a pro rata basis. Pursuit of any remedies against the firms from whom Plaintiffs and the Class purchased eggs subject to Defendants' conspiracy would have been futile, given that those firms did not take part in Defendants' conspiracy.

## PETITION FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court grant judgment against Defendants as follows:

1.    The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a *per se* violation of Section 1 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; or, alternatively, (d) acts of unjust enrichment by Defendants as set forth herein;

2.    Plaintiffs and the Damages Class recover damages, to the maximum extent allowed under the applicable state laws, and that a joint and several judgments in favor of Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

3.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution or disgorgement of profits unlawfully obtained;

4.      Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a pro rata basis;

5.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

6.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

7.      Plaintiffs and the members of the Damages Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

8.      Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

9.      Any other relief as the case may require and the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs request a trial by jury of all issues so triable.

87

DATED: July 30, 2026


/s/ David M. Cialkowski

| | |
|---|---|
| David M. Cialkowski | Michael J. Flannery |
| Ian F. McFarland | (admitted *pro hac vice*) |
| Zachary J. Freese | **CUNEO GILBERT FLANNERY &** |
| Giselle M. Webber | **LADUCA, LLP** |
| **ZIMMERMAN REED LLP** | Two City Place Drive |
| 1100 IDS Center | Second Floor |
| 80 S. 8th St. | St. Louis, MO 63141 |
| Minneapolis, MN 55402 | Tel: (314) 226-1015 |
| Tel: (612) 341-0400 | mflannery@cuneolaw.com |
| david.cialkowski@zimmreed.com | |
| ian.mcfarland@zimmreed.com | Evelyn Riley (admitted *pro hac vice*) |
| zachary.freese@zimmreed.com | Daniel Cohen (*pro hac vice* forthcoming) |
| giselle.webber@zimmreed.com | Cody McCracken (admitted *pro hac vice*) |
| | **CUNEO GILBERT FLANNERY &** |
| *Lead Counsel and Coordinating Counsel for* | **LADUCA, LLP** |
| *the Commercial Indirect Purchaser* | 2445 M St. NW |
| *Plainintiffs* | Suite 740 |
| | Washington, DC 20037 |
| | Telephone: (202) 789-3960 |
| | Fax: (202) 789-1813 |
| | evelyn@cuneolaw.com |
| | danielc@cuneolaw.com |
| | cmccracken@cuneolaw.com |
| | |
| | *Lead Counsel and Liaison Counsel for the* |
| | *Commercial Indirect Purchaser* |
| | *Plainintiffs* |
| | |
| | |
| Shawn M. Raiter | Laura K. Mummert |
| Matthew B. Bolt | Steven J. Greenfogel |
| **LARSON · KING, LLP** | (pro hac vice forthcoming) |
| 2800 Wells Fargo Place | **LITE DEPALMA GREENBERG &** |
| 30 East 7th St. | **AFANADOR, LLC** |
| Saint Paul, MN 55101 | 1515 Market Street, Suite 1200 |
| Telephone: (651) 312-6500 | Philadelphia, PA 19102 |
| sraiter@larsonking.com | (267) 314-7980 |
| mbolt@larsonking.com | lmummert@litedepalma.com |
| | sgreenfogel@litedepalma.com |

John "Don" Barrett
(*pro hac vice* forthcoming)
Katherine Barrett Riley
(*pro hac vice* forthcoming)
Sterling Aldridge (admitted *pro hac vice*)
**BARRETT LAW GROUP, P.A.**
404 Court Square
Lexington, MS 39095
Tel: (662) 834-2488
dbarrett@barrettlawgroup.com
kbriley@barrettlawgroup.com
saldridge@barrettlawgroup.com

Garrett D. Blanchfield
(admitted *pro hac vice*)
Brant D. Penney (*pro hac vice* forthcoming)
Roberta A. Yard (*pro hac vice* forthcoming)
**REINHARDT WENDORF & BLANCHFIELD**
80 South 8th Street, Suite 900
Minneapolis, MN 55402
Tel: (651) 287-2100
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com
r.yard@rwblawfirm.com

Timothy M. Hansen
Michael C. Lueder
**HANSEN REYNOLDS LLC**
301 N. Broadway, Suite 400
Milwaukee, Wisconsin 53202
Ph. (414) 455-7676
thansen@hansenreynolds.com
mlueder@hansenreynolds.com

*Local Counsel for the Commercial Indirect Purchaser Plaintiffs*

Joseph J. DePalma
(pro hac vice forthcoming)
**LITE DEPALMA GREENBERG & AFANADOR, LLC**
570 Broad Street, Suite 1201
Newark, NJ 07102
(973) 623-3000
jdepalma@litedepalma.com

Daniel E. Gustafson
(admitted *pro hac vice*)
Daniel C. Hedlund
(admitted *pro hac vice*)
Michelle J. Looby (admitted *pro hac vice*)
Joshua J. Rissman (admitted *pro hac vice*)
Abou B. Amara, Jr. (WI Bar #1135419)
Melanie Miller Kapanke (admitted *pro hac vice*)
**GUSTAFSON GLUEK PLLC**
120 So. Sixth St., Ste. 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com

*Steering Committee for the Commercial Indirect Purchaser Plaintiffs*

89